B. F. TISDALE, ADMINISTRATOR, v. UNION TANNING COMPANY.

(Filed 26 May, 1923.)

1. **Employer and Employee—Master and Servant—Safe Place to Work— Negligence—Evidence—Nonsuit—Trials.**

It is the duty of the employer to furnish his employee at a power-driven plant a reasonably safe place to work and proper tools and appliances to do the work required of him; and evidence tending to show that the employee had his clothes caught in a bolt in the coupling of a swiftly revolving shaft, left projecting .one-half inch beyond the coupling flange, not countersunk or protected, as he was returning from opening a window to let in air, according to the custom of employees in the mill, and in the

only way provided, thus causing his death, is sufficient to take the case to the jury upon the issue of defendant's actionable negligence, upon his motion as of nonsuit.

**2. Employer and Employee—Negligence—Assumption of Risk—Evidence —Nonsuit—Trials.**

Where the actionable negligence of the defendant is the proximate cause of the employee's injury, resulting in his death, the doctrine of assumption of risk does not bar the plaintiff's recovery. This and contributory negligence being matters of defense are not available to defendant in his motion as of nonsuit upon the evidence.

APPEAL by plaintiff from *McElroy, J.,* at January Term, 1923, of McDowell.

This is an action for damages for the negligent killing of plaintiff's intestate, Arthur Allison. He was working for the defendant tanning company at the time of his death, 29 January, 1920, assisting in the operation of a machine called a "drum dryer," into which machine liquid extract is poured and in which are two revolving drums heated from within so that in forty minutes from the time the extract is poured into the drum it is as dry as powder. It was in evidence that "from the south side of the machine to the south side of the building there was a space from 10 to 12, possibly 15, feet, and the line shaft was about three feet from the side of the building on the south, and there were windows along the wall on that side as well as on the other side of the building, possibly 6 or 8 on that side."

The witness further testified that between the drum dryer and the window, and about three feet from this wall, was a line shaft which extended through the building; the sections of this shaft were joined by couplings which were about 12 inches in diameter, disk-shaped and flanged, fastened together by bolts extending clear through them; the heads of the bolts were towards the west end of the building and the threaded ends towards the east. There were five or six bolts which held the disks together. One of these bolts, where the deceased was killed by his clothing being caught by it, was longer than the others and extended out about one-half inch beyond the others and on out past the flange. The end of this bolt was threaded and the threaded end projected about one-half inch beyond the tap. This particular coupling, through which this long bolt was placed, was almost directly in line with the window which had been opened during witness's absence from the building and in line with the drum dryer. The witness Allison, whom plaintiff's intestate was assisting, left the building to go over to the superintendent's office, telling deceased to watch the machine while he was away. The death of deceased occurred while the witness was at the business office. Upon his return he found young Allison dead, or practically so, lying under the line shaft near this coupling, his clothes being

wound around the line shaft and along it from the coupling back perhaps 15 to 18 inches, and the window opposite the coupling was open. This witness testified that it was the general custom which had existed as long as he had been working there of going over or under the shaft to raise or lower the windows. It was also in evidence that this was a warm day in January.

A. B. Setzer, another witness, testified in substance to the same facts as the above witness. He testified also to the long established general custom of going over or under the shaft by employees at will, to open or close the windows on the south side of the building. He testified that one set screw in this coupling was longer than the others, and extended out beyond the flange. Other witnesses testified in substance to the same facts, and all state that the custom existed and had existed ever since they had been working at the place, of going beyond the guard rail and line shaft to open the windows. There was no other way of getting to any of these windows to open them.

There was a wooden railing a few feet inside of the line shaft, towards the center of the building, but there was no railing between the line shaft and the windows on the south side of the building. Upon the evidence, the court directed a nonsuit, and the plaintiff appealed.

*Hudgins, Watson & Washburn for plaintiff.*
*Pless, Winborne & Pless and W. T. Morgan for defendant.*

CLARK, C. J. No one witnessed the actual death of the plaintiff's intestate, but the facts are very simple. It was the duty of the defendant to give his employees a reasonably safe place in which to work. The building was a tannery, and there was a long line of shafting, inside of which there was a wooden railing, which would be a protection to the public and others than employees who were not called upon to go near the machinery. Between this line shafting and the windows there was a three-foot space, and the evidence is that it had been customary for the employees, when they desired or found it necessary to open a window, to go over or under this line shaft as the only means of doing so. From the nature of the business this was a super-heated building, and in addition this was quite a warm day. The shafting was connected by couplings, and through every coupling there were five or six heavy bolts. The employee, as whose assistant the plaintiff's intestate was working, was called off to the business office leaving the plaintiff's intestate in charge. When he returned the window opposite this coupling was open and the deceased was found lying under the coupling with most of his clothing torn off and wrapped around the shafting, and there were indications that this clothing had been caught by an unprotected set screw in the coupling plates which projected beyond its tap.

The plaintiff contends that this was evidence taken in its most favorable light for the plaintiff, which must be done on a nonsuit, to show negligence on the part of the company. There was evidence that it was customary to raise this window from time to time, and that it had been customary, and indeed the only way for the employees to do so was to pass over the line shafting, or dodge under it, to get to the window, and it was evidence to go to the jury that this screw projected a half-inch beyond the tap whereby it is quite clear from the other evidence that the clothing of the deceased was caught and pulled off of him, and the deceased being thus caught was slowly revolved around the shafting, as one of the witnesses stated, until he dropped from it and was found lying dead or dying on the floor.

This Court has repeatedly held that it is negligence for the employer using rapidly revolving shafting to leave the point of the screws, or the taps, exposed, which may thus catch in the clothing of those nearby, exposing employees like the plaintiff's intestate to such danger. In all such cases ordinary prudence requires, as this Court has often held, that the point of the screw and the taps should either be countersunk or protected by a cup or some other similar device which will not catch in the clothing of the employee and drag him to his death. This is such a simple protection that an ordinary regard for the safety of the employees imperatively requires this to be done.

This screw point of a large screw holding the coupling together passing a half-inch beyond the tap readily would catch in the clothing of the deceased in returning from the window which he had opened and there was no other way for him to go to, or return from, the window except over or under this shafting, and the evidence is uncontradicted that it had always been the custom for the employees to go over, or under, this shafting to get to the window. The window was there to be opened, and was very often opened, and the defendant company not having provided any other way to reach the window except over or under the shafting, should have safeguarded the points of the bolts that were likely to catch in the clothing of the employee thus engaged, either by countersinking the point of the bolt, or if this was impracticable, by putting a cup over it or other protection.

If it be conceded that there was a rule of the company forbidding an employee to go over or under the shafting, still the evidence is that such rule had been habitually violated to the knowledge of the employer. In *Biles v. R. R.,* 139 N. C., 528, it is held: "Where a rule is habitually violated to the knowledge of the employer, or where a rule has been violated so frequently and openly and for a length of time that the employer should by the exercise of ordinary care have ascertained its nonobservance, the rule is considered as waived or abrogated."

In *Smith v. R. R.,* 147 N. C., 603, the Court said: "The law is that the violation of a known rule of the company made for an employee's protection and safety, when the proximate cause of such employee's injury, will usually bar a recovery. This is only true, however, of a rule which is alive and in force and does not obtain where a rule is habitually violated, to the knowledge of the employer, or those who stand towards the employer in the position of vice-principal, or when a rule has been violated so frequently and openly and for a length of time that the employer by the use of ordinary care could have ascertained its nonobservance." To the same purport, *Haynes v. R. R.,* 143 N. C., 154; *Bordeaux v. R. R.,* 150 N. C., 528, and the authorities to the above effect are numerous and uniform.

The operation of the tannery necessarily super-heated the building. The windows were there to be opened; there was no means for the employees to get to the windows for that purpose except by going under or over the line shafting, and the evidence was that this was constantly done by the employees.

Permitting the operation of a rapidly revolving line shaft with the threaded end of a bolt projecting out beyond the flange so that it might come in contact with the person or clothing of an employee in going to or from the window, there being no other method of opening the window, was negligence, and made the employer liable for any injury of which it was the proximate cause. Permitting a threaded bolt to be longer than the other bolts and extend out beyond the surface of the flange was negligence.

In *Eplee v. R. R.,* 155 N. C., 293, it was held that where a power drill, for boring holes in iron plates, left exposed set screws therein which were dangerous when the drill was being operated, these set screws should be, and usually are, covered or countersunk, and if this precaution is not taken it is not a proper tool to be used, and the master is liable. That case cites many others to the same effect that it is negligence for the employer to leave set screws unprotected, and not to countersink or protect set screws used in machinery. To this purport it was held in *Pressly v. Yarn Mills,* 138 N. C., 413, that if there is any negligent default in this or similar respects, and this negligence was the proximate cause of the injury, the first issue should be answered in the affirmative, and that assumption of risk is not a defense. Even if it were, assumption of risk and contributory negligence are defenses, and a nonsuit cannot be granted when, as in this case, there is prima facie evidence of negligence on the part of the employer. To the same purport are very numerous cases, among them, *Sims v. Lindsay,* 122 N. C., 681, where there was not a sufficient guard upon the machine which could be and was used on other machinery, and the nonsuit was set aside. See the

numerous annotations to that case in the Anno. Ed. See, also, *Hicks v. Mfg. Co.,* 138 N. C., 319, in which *Hoke, J.,* lays down the same ruling. *Lloyd v. Hanes,* 126 N. C., 359; *Womble v. Grocery Co., (Connor, J.),* 135 N. C., 474; *Ross v. Cotton Mills,* 140 N. C., 115; *Horton v. R. R.,* 145 N. C., 138, citing *Hoke, J.,* in *Fitzgerald v. R. R.,* 141 N. C., 530.

The defendant contends that the intestate was guilty of contributory negligence or assumption of risk, but these, as already stated, and as said in the authorities above quoted, were matters of defense for which the court could not grant a nonsuit.

In this case there was sufficient evidence which entitled the plaintiff to have the case submitted to the jury. For the error stated, there must be a

New trial.