LILA WEST, ADMINISTRATRIX OF HARLEY WEST, DECEASED, v. FONTANA MINING CORPORATION.

(Filed 30 December, 1929.)

1. **Appeal and Error E b—Where the charge of the lower court is not set out in the record it is assumed correct.**

   The charge of the judge to the jury is assumed to be correct on appeal when it is not set out in the record.

2. **Master and Servant C b—Employer must use reasonable care to provide reasonably safe place to work.**

   While an employer is not held to the liability of an insurer of the safety of his employees, he is required in the exercise of ordinary care to furnish them a reasonably safe place to do the work required of them, by the means and methods that are approved and in general use at places of like kind and character.

3. **Same—Evidence of negligent failure to provide reasonably safe place to work held sufficient to overrule nonsuit.**

   Where in an action to recover for the negligent killing of the plaintiff's intestate there is evidence tending to show that the intestate was killed by being caught by a piece of timber at the fourth level of defendant's mine while the intestate was riding in a car from one level to another in the performance of his duties, that the timber at the fourth level was lower than the timbers at the other levels, there being only about three inches clearance between the car and the timber, that there was no means of signalling the engineer operating the hoisting machinery at the surface of the mine to stop the car, that the track was uneven and came up in a hump where the injury occurred, that defendant's *alter ego* knew that the timber was dangerous; that there was no light at the fourth level, and that other mines of like character used enclosed cars: *Held,* sufficient to be submitted to the jury on the question of whether the defendant exercised reasonable care to provide a reasonably safe place to work.

4. **Master and Servant C f—Servant is not prima facie chargeable with assumption of extraordinary risks.**

   A servant is not prima facie chargeable with the assumption of an extraordinary risk, or a risk which may be obviated by the employer in the exercise of reasonable care.

**5. Same—Assumption of risks is ordinarily question for jury.**

In order to establish the defense of assumption of risk it is not sufficient to show that the employee worked on knowing the danger, but the question must be determined whether the danger was so obvious that a man of ordinary prudence would have quit the employment rather than have incurred it, and is ordinarily a question for the jury.

APPEAL from *Harwood, Special Judge,* and a jury, at July-August Term, 1929, of SWAIN. No error.

This is an action for actionable negligence, brought by plaintiff, Lila West, administratrix of Harley West, deceased, against defendant, Fontana Mining Corporation, for killing her husband, Harley West.

The defendant was engaged in mining copper ore in Swain County. Plaintiff's intestate was an employee of defendant. The allegations of the complaint as to negligence was to the effect that defendant did not use due and ordinary care to provide for plaintiff's intestate a reasonably safe place in which to do his work. The defendant denied the allegation of negligence and pleaded assumption of risk and contributory negligence.

Plaintiff's intestate was killed on 18 June, 1928, in the discharge of his duty. Defendant in its underground mining operations had several tunnels, one of which extended from the surface about 700 feet underground at an angle of about 45 degrees, or about one-half slope, being known as an incline or shaft—the tunnel was about 8 feet square. Along this tunnel was operated a narrow-gauge railroad for the purpose of bringing up ore and transporting employees into and out of the mine. A hoisting engine on the surface run by steam was the motive power, and the car or skip was let down into the mine and brought up by means of a wire cable or rope, which wound around a drum. There were about eight levels about 100 feet apart that intersected with the main shaft.

W. R. Barker testified in part: "They had about fifty men employed, I guess. The deceased was killed at the fourth level. I was on the level below. The last time I saw West immediately prior to his death, he was going up on the skip. Leonard McCoy, the conductor, was with him; it was about ten o'clock that night. *There was no light at the level* except the lights they had on their heads. West and the fellow on the skip had lights on their heads. They were miners' lamps. There were no lights on the fourth level provided by the Fontana Mining Corporation. The levels were about 100 feet apart. There was a piece of timber across the fourth level that the skip went up through under it. The dimensions of this skip was two or three feet deep. *The skip passed under the piece of timber across the fourth level just giving good clearance, something like three inches on one side, and maybe a little more on*

*the other. It was kind of bent on one side.* The timber was higher at other places in the levels, at the fifth, sixth and third levels was higher. *That was the only piece of timber there at that time that was down right near to the skip.* The conductor on the skip told the deceased it was time to take the dull steel out, and told him to get in the skip and go down and bring the steel up and take it out. I have ridden on the skip. *There is no signal device or anything on the skip where the hoisting engine at the top of the ground was operated could be signalled between the different levels to stop the skip or not,* as far as I know. I saw West hanging in between the skip and the timber and his head back behind the skip, and they backed the skip off of him and took him and put him in the skip. I don't remember that I heard him say anything. There were West and the skip conductor and the foreman on the skip. The foreman was Craig, Leonard McCoy was the conductor. *I saw the piece of timber catch him—he was between it and the skip when I saw him.* He only lived a half or three-quarters of an hour after that. They took him to the shop and he died. If the timber had not been there the men could stand up in the skip—good room to stand up. *There was no light in the shaft except the little lights that the employees had on their foreheads.* There was no other way provided for employees to go in and out of the mine except in the skip."

W. C. Sheppard testified in part: *"In putting this piece of timber across the fourth level at the time it was put there I asked Mr. Hughes to put the timber up higher. I told him it would be dangerous down there, and he said if it killed a man he would hire another one.* The incline track had waves or rolls up and down—they don't go on a certain degree at all, *and where it comes under the timber at the fourth level it comes out on a flat space, comes up a hump, and out on a flat space.* . . . (Cross-examination.) The place that we had there the skip cleared it from three to four inches, something like that. Q. And a man that got in the skip and stayed down in the skip was in absolutely no danger at all, was he? A. No, if he kept his head under the skip. Q. And in order to get hit he had to get up there in that place, didn't he? A. Yes. Q. If he was down in the skip and knew all about it—if he hadn't raised his head and got up, there was no danger of getting hit at all? A. No, not by the timber. Q. Nor anything else unless it fell from the top—that is right, isn't it? A. Yes, I would be afraid to say how many times I have ridden that shaft—several hundred times, anyway. Q. And you never got hit by this timber? A. No, for I stayed in the clear. Q. And this man knew that this timber was there? A. He ought to. I have never ridden down there with him. I couldn't say how long he had been carrying steel."

H. S. Brownfield, at one time mining inspector in the State of Ohio, testified in part: "I worked in two mines in Flushing, Ohio, that had an incline; the mines were about two hundred feet deep, *and in carrying men in and out they used man cages. Cage just like a big box—it is enclosed.* They have a fence that they put up when they hoist the men up and down. (Cross-examination.) Don't work anywhere now. I live in Asheville; been there since 1925. I have been to Fontana; I didn't go down in the mine. Over your objection I stated that in a coal mine they used a cage. *It is a cage that covers a man entirely; you can't stick your head out;* that was a coal mine about two hundred feet deep."

D. W. Byrd, who worked in mines about sixteen years, testified in part: "At the Burr mine and London mine they have shafts on an incline road to convey the men in and out of them. The Burr mine had twelve levels, and the London mine nine, I believe. There was an incline up this shaft past each of the levels; there were timbers in the shaft. *The men that worked in the Burr and London mines in Tennessee, were conveyed in and out of the mines with the man cage. A man cage is a steel cage that is fastened by bars. It is closed when the men are going in and out of the mine to keep any part of them getting out or getting caught,* and in these mines the men who convey the powder and steel use the cage that is used for the men."

The issues submitted to the jury, and their answers thereto, were as follows:

"1. Was the plaintiff's intestate injured and killed by the negligence of the defendant, as alleged in the complaint? Answer: Yes.

2. Did plaintiff's intestate by his own negligence contribute to his injury and death, as alleged in the answer? Answer: No.

3. What damage, if any, is plaintiff entitled to recover? Answer: $5,000."

The defendant introduced no evidence. At the close of plaintiff's evidence the defendant moved for judgment as in case of nonsuit. C. S., 567. The motion was overruled, defendant excepted, assigned error and appealed to the Supreme Court.

*B. C. Jones and Edwards & Leatherwood for plaintiff.*
*A. Hall Johnston for defendant.*

CLARKSON, J. The charge of the court below is not set forth in the record; the presumption is that the court below charged fully under the facts the law applicable to negligence, contributory negligence and damage. *Crisp v. Thread Mills,* 189 N. C., 89.

In *Street v. Coal Co.*, 196 N. C., at p. 181-2, the law is thus stated: "It is the duty of the employer, in the exercise of ordinary care, to furnish an employee with a reasonably safe place to work. This is especially so where the place is more or less dangerous. The employer is not an insurer of the employee's safety. Before directing an employee to work in a place of more or less danger, it is the duty of the employer to use due care to see that the place is reasonably safe for the employee to perform his work. To do this, it is the duty of the employer to use such means and methods that are approved and in general use at a place of like kind and character." *Deligny v. Furniture Co.*, 170 N. C., 189; *Jefferson v. Raleigh*, 194 N. C., 479; *Mauldin v. Chair Co.*, 196 N. C., 122; *Ellis v. Herald Co.*, 196 N. C., 262; *Shorter v. Cotton Mills*, ante, 27.

In the present case the plaintiff's intestate, who carried steel to the workmen and took the dull steel up, in the underground operation of defendant's copper mine, was required to ride in a car or skip when it went up and down in the narrow gauge railroad in the mine, in the performance of his duty. The underground narrow-gauge railroad extended from the surface about 700 feet down into the earth, the incline being about 45 degrees. In the mine there were about eight levels, about 100 feet apart, that intersected with the main shaft. Plaintiff's intestate was killed at the fourth level. A witness for plaintiff testified "I saw the piece of timber catch him; he was between it and the (car or) skip when I saw him." The evidence of plaintiff was to the effect: (1) That the car or skip passed under the piece of timber across the fourth level just giving clearance, something like three inches. (2) That the piece of timber that caught plaintiff's intestate at the fourth level was the only piece of timber that "was down right near to the (car or) skip." (3) There was no signal device on the car or skip to the engineer running the hoisting engine on the surface by which he could be signalled to stop or start the car or skip being operated underground at the different levels. (4) The incline track had waves or rolls up and down and at the fourth level where plaintiff's intestate was killed "it comes out on a flat space, comes up a hump and out on a flat space." (5) The *alter ego* of defendant when constructing the fourth level was asked to put the timber higher and was told it would be dangerous, and he said "If it killed a man he would hire another one." (6) There was no light at the fourth level. (7) A former mining inspector and miner of years of experience in other mines, testified that the method used in other mines of like kind and character "in carrying men in and out they used man cages, cage just like a big box; it is enclosed . . . is a cage that covers a man entirely; you can't stick your head out."

On the question of negligence of defendant, there was ample evidence to be submitted to the jury as to whether the defendant, in the exercise of due or ordinary care, provided plaintiff's intestate a reasonably safe place in which to do his work.

As to whether plaintiff's intestate was guilty of contributory negligence or assumed the risk, Labatt, Master and Servant, 3d Vol., 2d ed., part sec. 1178, p. 3143, speaking to the subject, says: "A principle which has been formulated and applied so frequently as to have become axiomatic is that a servant is prima facie not chargeable with an assumption of extraordinary risks—risks, that is to say, which may be obviated by the exercise of reasonable care on the master's part." *Hough v. Texas & P. R. Co.,* 100 U. S., 213, 25 L. Ed., 612, 615; *Lloyd v. Hanes,* 126 N. C., 359; *Wilson v. Lumber Co.,* 185 N. C., 571. The principle laid down by Mr. Labatt as axiomatic, has long been the law in this jurisdiction.

In *Hicks v. Mfg. Co.,* 138 N. C., 319, *Justice Hoke,* writing for the Court, lucidly and humanely goes into the entire subject. According to Shepard's N. C. Citations, June, 1929, that case has been cited forty-one times.

In *Hines v. R. R.,* 185 N. C., at p. 75, it is said: "Assumption of risk is also a matter of defense analogous to contributory negligence to be passed upon by the jury who are to say whether the employee voluntarily assumed the risk; it is not enough to show merely that he worked on, knowing the danger. *Lloyd v. Hanes,* 126 N. C., 359; the numerous cases cited thereto in the Anno. Ed.; C. S., 3468."

In *Hamilton v. Lumber Co.,* 156 N. C., at p. 523-4, speaking to the subject: "It is further held, in this jurisdiction, that the doctrine of assumption of risk, in its technical acceptation, is no longer applicable *(Norris v. Cotton Mills,* 154 N. C., 475; *Tanner v. Lumber Co.,* 140 N. C., 475), but the effect of working on in the presence of conditions which are known and observed must be considered and determined on the question whether the attendant dangers were so obvious that a man of ordinary prudence and acting with such prudence should quit the employment rather than incur them.' *Bissell v. Lumber Co.,* 152 N. C., 123." *Ogle v. R. R.,* 195 N. C., at p. 797.

In the judgment of the court below we find

No error.