DEWEY C. SWANEY v. PEDEN STEEL COMPANY.

(Filed 14 June 1963.)

1. **Master and Servant § 18;     Sales § 16—**

A company designing and fabricating a steel truss for use in the erection of an edifice may be held liable by an employee of the contractor injured as the result of the collapse of the truss through faulty design while is was being erected by methods which could have been reasonably anticipated, since the manufacturer of a chattel is liable to those whom he should expect to use the chattel, or to be in the vicinity of its probale use, for injury caused by defects in the chattel in its use in the manner for which the chattel was supplied.

2. **Same—**

The evidence in this case to the effect that plaintiff worker was injured while "riding the load" in erecting a steel truss fabricated by defendant when the truss collapsed at its apex because of defect in design, that the truss would have collapsed even though the workmen had not "ridden the load," and that the erection of the truss in the manner directed by plaintiff's employer was a customary manner that should have been anticipated by defendant, *held* to take the issue of defendant's negligence to the jury.

3. **Statutes § 1;     Evidence § 36—**

The Safety Code for Building Construction is not referred to in the North Carolina Building Code and does not have the force of law through enactment by reference. G.S. 143-138, and therefore the safety code is not admissible in evidence.

4. **Master and Servant §§ 18, 23—**

The violation of a rule issued by the Department of Labor under G.S. 95-11 for the purpose of protecting construction employees from dangerous methods of work may not be asserted by a third person tort feasor as contributory negligence of the employee so as to relieve itself of liability for injury to the employee proximately caused by its negligence.

5. **Negligence § 11—**

Where a statute fixes a standard of conduct and provides that its violation should be a criminal offense, its violation is negligence *per se* in

a civil action instituted by a person who has sustained injury proximately resulting from such violation, but where no statute fixes a standard of conduct, whether the injured person's conduct amounts to contributory negligence must be determined by the rule of the reasonably prudent person under the circumstances.

**6. Same;  Master and Servant § 29—**

An employee will not be held contributorily negligent as a matter of law in obeying an order of his superior unless the order is so obviously dangerous that a reasonably prudent man, under similar circumstances, would have disobeyed the order and quit the employment rather than incur the hazard.

**7. Negligence § 12—**

Assumption of risk will not bar recovery when the factor causing the injury cannot be considered to have been included in the risk to which plaintiff exposed himslf in taking the position of peril, since assumption of risk is founded on knowledge.

**8. Negligence § 26—**

Contributory negligence become a question of law only when plaintiff's evidence so clearly establishes it that no other reasonable inference may be drawn therefrom.

**9. Master and Servant § 18—**

Evidence that a construction worker "rode the load" in erecting a truss and was seriously injured when the apex of the truss collapsed, that "riding the load" was usual and customary in such work, and that the worker had no means of knowing that the truss had not been designed to withstand the stress of erection in such manner, *is held* not to disclose contributory negligence as a matter of law on the part of the worker in his action against the designer and fabricator of the truss.

APPEAL by defendant from *Olive, J.*, at the February 1962 Term of RANDOLPH. This appeal was docketed in the Supreme Court as Case No. 527 and argued at the Fall Term 1962.

Plaintiff, a steel erector, instituted this action to recover for personal injuries he sustained when a truss, which defendant had designed and fabricated, collapsed during the process of erection.

Plaintiff alleges in substance (1) that the defendant negligently designed and constructed the truss in that the connection of its two members was too weak to sustain the load and stress of erection; (2) that although defendant knew, or should have known, the manner in which the truss would be erected, it failed to warn plaintiff's employer that the usual method could not be safely employed; and (3) that defendant's negligence thereby proximately caused his injury. The defendant denied all allegations of negligence and alleged that plaintiff's injuries were caused solely by the negligence of his employer in

that he attempted improper erection methods and thereby put the ultimate stress on the truss. Defendant further alleged that plaintiff himself was guilty of contributory negligence in that he rode the end of one of the truss members in the course of erection contrary to safety rules and regulations, thereby incurring a prohibited risk and placing a stress upon the truss which it was not designed to carry. Other allegations of the answer are not pertinent to this appeal.

The jury answered the issues of negligence and contributory negligence against defendant and awarded plaintiff substantial damages. From judgment on the verdict, the defendant appealed. On the argument before us defendant abandoned all assignments of error except those relating to the denial of its timely made motions for nonsuit.

The evidence in the case, taken in the light most favorable to the plaintiff, discloses:

In 1957, the Edenton Street Methodist Church in Raleigh was being rebuilt after a disastrous fire. The defendant, Peden Steel Company, had the contract to furnish the steel. George Newton, sole proprietor of Newton Construction Company, had the contract to erect the steel structure of the building. Plaintiff was an employee of Newton.

The church building (sanctuary) consists of the nave (auditorium) and the chancel (alter and choir area) which are separated by a masonry arch faced with limestone. The roof line of the chancel is two feet lower than the roof line of the nave. The plans for the church called for a masonry wall on each side of and above the arch. This wall was to extend from the foundation to the roof and carry the purlins which would support the roof structure at this point. In March, Newton began to erect the perpendicular steel columns which are attached to the foundation and to which are fastened the rigid frame trusses which carry the purlins. He had located his crane in the basement to the rear of the church so that the crane could work itself out of the building as it set the columns, trusses, and purlins from the back forward There was a delay in getting the limestone facing for the arch in the partition wall between the nave and the chancel. The wall was only about ten or twelve feet out of the ground when Newton was ready to erect the purlins it was intended to carry. If the erection of the church was not to be unduly delayed, some temporary support for the roof purlins had to be designed and erected.

About March the 27th, the church architect and the building superintendent requested Donald E. Shreffler, the chief engineer and designer of Peden Steel Company, to design a steel structure which would temporarily do the work of the wall and eventually be enclosed by it. He designed an A-type framework which was supposed to bear the

load of the purlins and the roof structure for about two months. On adverse examination he testified that he made computations of the load its various members would be required to carry *after* erection, the exact weights to go into it, and decided what bolts were to be used in the connections. He said he gave no consideration to the method of erection because he did not consider it an unusual problem. The framework designed consisted of two upright columns, each a ten-inch wide H section, approximately thirty-eight feet long and welded to a twelve-inch base plate about three inches larger than the column itself. These plates were bolted, approximately twenty-seven feet apart, to the two-foot partition wall at the floor level.

A truss in the shape of an inverted V was to be fitted down over the top of the two steel columns. The design of this truss was very unusual. None of the expert witnesses for plaintiff or defendant had ever seen one like it before. It was composed of four principal steel members. Each side, or rafter, of the V was made up of two channels each approximately thirty-seven feet long and twelve inches wide with a three-inch flange on one side. They were bolted back to back to five ten-inch flanges or beams, called spacers or separators, which maintained the two channels in a parallel position two feet apart. The channels were thus separated because the chancel purlins were two feet lower than the auditorium purlins. The truss portion of this framework weighed 4,147 pounds.

The two sides of the truss were connected to a wide flange separator at the apex by six threaded, ¾ x 2-inch machine bolts, three through each channel. One side was bolted to the center separator at the apex in the defendant's shop. These bolts are referred to as shop bolts. The two sections had to be finally connected at the site of construction because the assembled truss would have been too broad to transport across Raleigh. The steel for the columns and the two sections of the frame arrived at the job on April 4, 1957, the date it was to be erected. The paint on it was not dry. No strut for the truss came with these parts, and defendant sent no directions for its erection.

Working in the basement of the church, Newton's crew bolted the other side of the truss to the spacer at the apex with bolts furnished by the defendant for the purpose. These bolts are referred to as field bolts. The two sides were connected on a bias to form an obtuse angle. It was the customary and approved practice for erectors to make such connections on the ground. After the truss was assembled, ⅝-inch steel cables, called chokers, were placed around each member at the second separator down from the apex, approximately one-third of the distance from the center to the bottom. Then spreaders (hooks) from

the crane were attached to the chockers. Another piece of cable was fastened in a ring at the top with two hooks on each end of the half which was, in turn, hooked into the choker. Newton and his son, the foreman on the job, were in charge of this particular erection. After the truss had been hooked to the boom of the crane, it was raised from the basement to an upright position and moved as close to the wall as possible. While it was hanging perpendicularly, two men got on each end and shook or bounced it to make certain that it was firmly based and would not tip over during erection.

When the truss had been lifted about two feet from the ground the foreman gave the order, "You high erectors, all aboard." The plaintiff, who weighed about 190 pounds, and his teammate Wright, who weighed from 160 to 165 pounds, each mounted the truss on opposite sides at the second separator from the end. Plaintiff's foot was against the second member and he was holding to the top channel. The engineer operating the crane was directed to raise the truss slowly and to keep it going. The upward movement was not stopped until the truss got about level with the top of the columns when there was a snap. The six shop bolts at the apex had sheared and the truss "scissored." Wright jumped off onto a column wet with paint. He could not hold and slid down it, receiving comparatively minor injuries. When the two halves came together plaintiff was knocked off. He fell to the ground on a pile of brick and rubbish in the basement sustaining permanent and tragic injuries. His left arm was amputated and he is now a paraplegic.

In order to erect the truss, it had to be lifted above and brought down over the tops of the two columns so that the truss holes were aligned with the column holes. To do this the men had to be on top of the truss so that they could align the holes with a spud wrench, then reach under, put the bolt in and draw it up tight. Newton, who had been in the business fifty years, considered this the only safe method of erecting this truss. On the column there was no place for a man to stand except on one end of the lugs at the top. If the boom should hit the column, the man might fall off; if the truss should hit the man, it might decapitate him. One-half could not be set at a time because so much weight would twist the small column, and a man would still have had to get on top to make the connection. A welding platform was not feasible because there was not enough space on top of the ten-inch wide flange column to tie or hook to. It would tip over and throw a man into the hole below. Furthermore, from the top of the platform, below the connection, it would not have been possible to guide the truss down. It is not customary or approved practice in the erection business to use ladders to make a connection of the height

and size of this one. A thirty-six foot ladder is as high as is ever used. A forty to forty-five foot ladder set in the basement would have been required to erect this truss and would have put too much pressure on the column in addition to putting the man beneath the load.

It was the consensus of plaintiff's witnesses, including the experts, that steel erection at its best is hard, rigorous, and dangerous work; that it is not the practice for steel erectors to ride the load unless they feel it is the safest way to make a connection; that the method Newton chose was in accordance with the custom and practice in the industry and was the safest way.

R. C. Craven of the Craven Steel Erecting Company, who has been in the business since 1910, testified: "As to the custom in the erection trade, we would either climb the column or hook a man on and set him up there, or let him ride the load, whichever we thought was the safest. . . .All of the accident prevention manuals have regulations against erectors riding the load but, as a practical matter in the field, we let them ride the load." Other experts in the erection business testified to the same effect. "The practice is that if it is necessary they ride the load."

While ordinarily the erector chooses the methods of erection, it is the responsibility of the designer to provide directions in extraordinary situations. If no directions are provided, the erector will assume that the members and connections have been designed so that the piece will hold together safely under ordinary methods of erection.

The day after the accident in which plaintiff was injured, an angle iron, ten to twelve feet long, was welded on the low members of each half of the truss and on the high members of each half with a strut between. The truss was also welded at the apex. It was then attached to the crane in the same manner as on the day before, and the connection was made in the manner which had been attempted the previous day. Two men again rode the load up. One was Leonard C. Newton, the son of George Newton and the foreman on the job.

John D. Watson, an expert structual engineer who had examined the drawings and specifications for the truss which collapsed, testified that there were recognized procedures for determining the weights and strains which bolts will bear. In answer to a hypothetical question, he expressed the opinion that the bolts sheared because the connection was thirty-seven per cent deficient in design to withstand erection in the manner attempted; that the dead load of the truss itself caused the bolts to shear and it would have collapsed while being lifted had the two men not been on it; that instead of machine bolts, high strength bolts not threaded all the way, rivets or welding might have been used.

In his opinion the truss was bound to fail during erection even had the spreaders not been attached to the second separators and if all force had been applied vertically; even if the men had not bounced up and down on it before erection was attempted, and regardless of the rate of its acceleration. He said Newton was entitled to assume that he could test the connection and erect it as he attempted to do; that steel erectors lack the knowledge and cannot make calculations on the job as to stresses and strains on bolts. Responsibility rests on the designer to prepare a structure that will be stable through erection and afterwards.

Defendant likewise offered the testimony of expert structual engineers. One of them, Donald H. Kline, testified that, based on calculations which had taken him a day and a half, it was his opinion the truss was satisfactory in every way; that its collapse was not caused by its design or construction but might have been caused by faulty erection procedures such as bouncing the truss with four men on it before hoisting it. He said, however, if it were known in advance that men would test the connection and then attempt to erect it in the manner which Newton did, the design would have been grossly defective and he would have anticipated that the connection would fail. His figures indicated to him that the truss would not have failed from its own dead weight and that of the two men. Other experts testifying for the defendant concurred. In their opinion, the collapse was caused by mishandling the structure in the field — either bouncing or improperly placing the chokers.

All the experts agreed, however, that in designing steel, erection loads and stresses should be taken into consideration. Defendant's witnesses suggested that either of the following methods could have been used to get the truss safely into place: The rafters could have been erected one at a time; a ladder or a scaffold could have been put up; a temporary strut could have been tack-welded to the underside of the rafter about five or six feet down from the peak; a special rigging or spreader bar could have been used with guy lines to pick the load straight up; or the spreaders could have been attached at the third separator or lower, using a third sling.

Defendant introduced in evidence the North Carolina Building Code, 1953 Edition, with particular reference to Sections 900 and 914, and the North Carolina Department of Labor's Rules and Regulations Governing the Construction Industry with particular reference to Articles I, II, and Section 18 of Article XXV.

Plaintiff testified that he was not familiar with either the North Carolina Building Code, the Rules and Regulations Governing the Construction Industry of the Department of Labor, or the American

Standard Safety Code for Building Construction, and that he took his orders from either Mr. George Newton or his son.

*McLendon, Brim, Holderness & Brooks by Hubert Humphrey, Wilson & Clark for plaintiff appellee.*

*T. Lacy Williams, J. Ruffin Bailey, Miller and Beck for defendant appellant.*

SHARP, J. Was the foregoing evidence sufficient to go to the jury on the alleged negligence of the defendant and, if so, does plaintiff's evidence establish his contributory negligence as a matter of law? These are the two questions for decision.

The defendant, as the designer and fabricator of the truss which collapsed during erection, was under the duty to exercise reasonable care not only to furnish a framework which would sustain the load it was intended to carry after erection, but which would also withstand the ordinary stresses to which it would be subjected during erection by methods reasonably to be anticipated. If a negligently designed truss were furnished, a workman on the construction job was within the foreseeable zone of danger and, if it proximately caused him injury, the designer would be liable under the principle which imposes liability upon a manufacturer who puts into the circulation a product which, if not carefully made, is likely to cause injury to those who lawfully use it for its intended purpose. *Person v. Cauldwell-Wingate Co.,* 176 F. 2d 237; *Williams v. Stores Co., Inc.,* 209 N.C. 591, 184 S.E. 496; *Tyson v. Manufacturing Co.,* 249 N.C. 557, 107 S.E. 2d 170, 78 A.L.R. 2d 588; *Gwyn v. Motors, Inc.,* 252 N.C. 123, 113 S.E. 2d 302; *Wyatt v. Equipment Co.,* 253 N.C. 355, 117 S.E. 2d 21; *International Derrick & Equipment Co. v. Croix,* 241 F. 2d 216.

The general rules of law applicable to the question of defendant's alleged negligence have been stated in the following sections of the Restatement, Torts:

> "A manufacturer of chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design." § 398. He is also liable if he supplies a "chattel for another's use knowing that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect to be put," § 389.

"One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." § 388. This section applies to "the manufacturer of a chattel which he knows to be, or to be likely to be, dangerous for use," § 394.

When defendant delivered the truss and the columns which were to support it to the Edenton Street Methodist Church job, it knew that steel erectors like the plaintiff would attempt to hoist and set the truss on the perpendicular columns. Its engineer who designed the truss was the one who knew, or should have known, both its strength and the erection stresses its bolts would be required to withstand. These were matters beyond the knowledge and ability of an ordinary steel erector to divine. Unless the truss had been so obviously defective that an erector of ordinary prudence would not have attempted to erect it, Newton was justified in assuming that it could be erected in the customary way. *Ryan v. Fenney and Sheehan Bldg. Co.*, 239 N.Y. 43, 145 N.E. 321; *Johnson v. West Fargo Mfg. Co.*, 255 Minn. 19, 95 N.W. 2d 497; *International Derrick & Equipment Co. v. Croix, supra; Babylon v. Scruton*, 215 Md. 299, 138 A 2d 375. If the defendant knew, or in the exercise of proper care should have known, that the design of the truss made it unsafe to attempt erection by the usual and ordinary methods, it was the defendant's duty to warn Newton of these facts. It does not contend that it gave any information or instruction with reference to erection. Defendant contends that Newton attempted the erection in an unusual manner and that it cannot be held liable for an injury which occurred from a use it could not reasonably have anticipated. *Lemon v. Lumber Co.*, 251 N.C. 675, 111 S.E. 2d 868; Anno. Products Liability — Building Supplies, 78 A.L.R. 2d 696, 701; *International Derrick & Equipment Co. v. Croix, supra*.

The evidence in this case, although conflicting, was sufficient for the jury to find (1) that Newton attempted to erect the truss in the customary manner and in a way which defendant should reasonably have

anticipated; (2) that in designing the truss, defendant's engineer did not take into account the stresses of erection and that the dead-weight of the truss itself, without the weight of the two men on it, would have caused the bolts to shear; and (3) that the steel erectors had no way of knowing its weakness unless informed of it by defendant which failed to perform this duty.

If the jury found these facts against the defendant the conclusion that its negligence was at least a proximate cause of plaintiff's injury necessarily followed. The jury exonerated Newton of any negligence proximately causing injury to the plaintiff, and no assignment of error challenges the trial on that issue.

We come now to the question of plaintiff's contributory negligence, the defense upon which defendant relies most heavily. It contends that when plaintiff rode the load upward to attach the truss to the upright columns he was guilty of contributory negligence as a matter of law because (1) riding the load was so obviously dangerous it was plaintiff's duty to refuse to obey the order to do so and he assumed all the risks incident thereto when, instead of refusing, he knowingly placed himself in a position of danger; and (2) in riding the load, plaintiff violated both a standard safety rule of the industry incorporated in the North Carolina Building Code and a regulation of the Department of Labor having the force of law.

Defendant did not specifically plead any of the safety rules upon which it now depends. However, in its brief, it relies upon § 18 of Article XXV of the Rules and Regulations Governing the Construction Industry issued by the Department of Labor and the American Standard Safety Code for Building Construction, No. A10.2-1944, approved June 7, 1944 by the American Standards Association which, it contends, § 914 of the North Carolina Building Code incorporated. The General Assembly has given the North Carolina Building Code the force of law. Therefore, the National Electrical Code which it *incorporated* with the approval of the legislature also has the force of law. G.S. 143-138; *Lutz Industries v. Stores,* 242 N.C. 332, 88 S.E. 2d 333; *Drum v. Bisaner,* 252 N.C. 305, 113 S.E. 2d 560; *Jenkins v. Electric Co.,* 254 N.C. 553, 119 S.E. 2d 767.

However, this Safety Code for Building Construction which defendant stresses so forcibly and from which it purports to quote in the brief, is not referred to anywhere in the North Carolina Building Code. § 914 refers to two other named publications, neither of which has been filed with the Secretary of State as required by G.S. 143-195. Apparently they relate to *specifications* for the design, fabrication and erection of structual steel itself — not rules safeguarding steel erectors.

Furthermore, this Safety Code for Building Construction was not offered in evidence at the trial nor would it have been competent if offered. *Sloan v. Light Co.*, 248 N.C. 125, 102 S.E. 2d 822.

North Carolina is in accord with the majority view that advisory codes which have not been given compulsory force by the legislative body, whether issued by governmental agencies or voluntary safety councils, are not admissible in evidence in civil actions. *Sloan v. Light Co., supra;* 38 Am. Jur., Negligence, § 170; Anno: Evidence — Safety Codes — 75 A.L.R. 2d 778; 1962 Cumulative Supplement to 20 Am. Jur., Evidence, p. 175, addenda to footnote 8, p. 815 of the Text. For a discussion of the problem, see the article entitled "The Role of Administrative Safety Measures in Negligence Actions," 28 Texas Law Review 143.

Defendant introduced in evidence the following sections from the "Rules and Regulations Governing the Construction Industry" issued by the Department of Labor under G.S. 95-11:

> "No employee shall be allowed to ride at any time upon any material elevator or hoist. Nor shall they be permitted to ride upon the sling, load, hook, ball or block of any derrick or crane or in the bucket of any hoist, except when deemed necessary for making repairs or oiling overhead sheaves; provided that this section shall not apply to stacks or caissons nor to the dismantling of hoist, derricks, cranes and towers." Article XXV, § 18. (Hereinafter referred to as Rule 18)
>
> "Every employee shall use all safeguard and safety appliances or devices furnished for his protection and shall be responsible for carrying out all rules and regulations which may concern or affect his conduct." Article II, § 1.

The charge of the court is not in the record, but presumably these rules were received as evidence tending to establish contributory negligence on the part of the plaintiff. The defendant received whatever benefit was to be derived from the introduction of these rules and assigns no error with reference to their use. It now contends they establish plaintiff's contributory negligence as a matter of law. This contention is untenable.

The legislature has not given the rules governing the construction industry promulgated by the Department of Labor the same force of law which it gave the North Carolina Building Code. G.S. 143-138, which ratified and adopted the Building Code of 1953, made any violation of its provisions a misdemeanor and therefore, negligence *per se* in any civil action instituted by a person who has sustained in-

juries proximately caused thereby. However, the legislature imposed no criminal penalty for a violation of the Department of Labor's construction regulations. G.S. 95-13 provides that if any person, firm, or corporation shall, after notice from the Commissioner of Labor, violate the rules promulgated under G.S. 95-11 relating to safety devices or measures, the Attorney General may take proper *civil* action to enforce them. Obviously, since the rules were formulated for the protection and welfare of the employees, such action for injunctive relief would be taken only against the employer. It is noted that regulations made by the Department of Labor to carry out the provisions of the Child Labor Law are, by statute, given the force of law and criminal penalties imposed for their violation. G.S. 110-20.

When noncompliance with an administrative regulation is criminal, the rule that in the trial of a civil action the violation of a criminal statute, unless otherwise provided, is negligence *per se,* is applicable. *Jenkins v. Electric Co., supra; Hinson v. Dawson,* 241 N.C. 714, 86 S.E. 2d 585. The General Assembly could specifically provide that the violation of an authorized administrative rule fixing reasonable standards of conduct would be either negligence *per se* or evidence of negligence in specified instances. "Whatever force and effect a rule or regulation has is derived entirely from the statute under which it is enacted. . . ." 2 Am. Jur. 2d, Administrative Law, Section 289.

However, neither the legislature, when it authorized the Division of Standards and Inspection of the Department of Labor to promulgate rules and regulations to protect "the health, safety and general wellbeing of the working classes of the State" (G.S. 95-11), nor the Division when it wrote the rules, intended to create a criterion for negligence in civil damage suits. The rule in question is a prohibition upon the employer, and does not prohibit riding the load in all instances. It recognizes the necessity in the enumerated exceptions. The purpose of these rules was to require employers to provide safe working conditions for employees in order to minimize the risk of injury to them; it was not to establish a standard of care by which to judge an employee in his action against a third party whose negligence has injured him.

Even had the legislature given these rules the force of law, and if it be conceded *arguendo* that plaintiff had violated Rule 18 above, such violation would not necessarily be contributory negligence barring his recovery against a third party whom the rule was not intended to protect. 1962 Cumulative Supplement to 20 Am. Jur., *supra;* 38 Am. Jur., Negligence, § 196; 5 Am. Jur., Automobiles, § 409; *Town of Remington v. Hesler,* 111 Ind. App. 404, 41 N.E. 2d 657; *Watts v. Montgomery Traction Co.,* 175 Ala. 102, 57 So. 471; *Bateman v.*

*Doughnut Corp. of America*, 63 C. A. 2d 711, 147 P. 2d 404; *Rampon v. Washington Water Power Co.*, 94 Wash. 438, 162 P. 514; *Flynn v. Gordon*, 86 N.H. 198, 165 A. 715. See also *Wright v. So. R.R. Co.*, 80 F. 260; *Huckabee v. Grace*, 48 Ga. App. 621, 173 S.E. 744.

Rule 18 could not be applied to the facts in this case without doing violence to fundamental principles and to the purpose of the rule. To do so would turn a regulation designed as a shield to protect a workman from an overreaching employer into a sword with which a third person tortfeasor, after he had negligently injured the employee, would administer the *coup de grace*.

We hold that plaintiff violated no law which would make him guilty of negligence *per se*. However, where no statute fixes the standdard of conduct, it is that of the reasonably prudent person under the circumstances. We now measure plaintiff's conduct by that rule.

The plaintiff in this case was covered by the Workmen's Compensation Act, but let us assume that prior to its enactment in 1929 Newton had promulgated a rule against employees riding the load; that in violation of his rule he had ordered plaintiff to go up with the truss; that plaintiff obeyed and because of a defect in the hoisting crane he fell to the ground and was injured. A plea of contributory negligence would not have availed Newton unless the order plaintiff obeyed was so obviously dangerous that a reasonably prudent man under similar conditions would have disobeyed it and quit the employment rather than incur the hazard. *Noble v. Lumber Co.*, 151 N.C. 76, 65 S.E. 622; *West v. Mining Corp.*, 198 N.C. 150, 150 S.E. 884.

The law governing suits by servants against masters in common law actions ordinarily bars recovery when a servant's injuries are proximately caused by his violation of a known safety rule promulgated by the employer for the employee's protection and safety. However, if a rule has been habitually violated to the employer's knowledge, or violated so frequently and openly for such a length of time that in the exercise of ordinary care he should have ascertained its nonobservance, the rule is waived or abrogated. *Biles v. R.R.*, 139 N.C. 528, 52 S.E. 129; *Haynes v. R.R.*, 143 N.C. 154, 55 S.E. 516, *Smith v. R.R.*, 147 N.C. 448, 61 S.E. 266; *Tisdale v. Tanning Co.*, 185 N.C. 497, 117 S.E. 583; *Byers v. Hardwood Co.*, 201 N.C. 75, 159 S.E. 3.

Certainly the defendant in this case who knew of the universal custom of steel workers to ride the load, like the master in common law actions, should not be allowed to defeat plaintiff's recovery for injuries which its negligence proximately caused by relying upon a rule promulgated for the employee's protection, the violation of which would have been harmless but for defendant's negligence.

Plaintiff had no means whatever of knowing that the truss had not been designed to withstand the stress of erection. He obeyed a usual and customary order of his employer with no knowledge that an administrative agency had issued a rule against it or that advisory safety codes prescribed it. The day after the truss collapsed with him, Newton erected the reinforced framework in the same manner he had attempted the day before, his son riding the load in plaintiff's stead. Logically, it might be argued that when plaintiff mounted the truss he assumed the risk that he would lose his grasp on it, become dizzy, or that his foot would slip during the upward ride, but he did not assume a risk he could not have anticipated. Assumption of risk is founded on knowledge. *Batton v. R.R.*, 212 N.C. 256, 193 S.E. 674; *Womble v. Grocery Co.*, 135 N.C. 474, 47 S.E. 493.

When a plaintiff has put himself in a dangerous situation, and while there is injured by the negligence of another, it is not always easy to determine whether his physical presence at the time and place was one of the proximate causes contributing to his injury or merely the opportunity or occasion for it. Sometimes a court solves the problem in favor of the injured plaintiff by putting the ultimate stress on the doctrine of proximate cause. *Lerette v. Director General of Railroads*, 306 Ill. 348, 137 N.E. 811. Of course, the specific accident would rarely happen to a particular plaintiff but for the fact that he was where he was at the time and place it occurred. However, mere presence at a place is not usually determinative. *Berry v. Sugar Notch Borough*, 191 Pa. 345, 43 A. 240; *Bonnier v. Chicago, B. & Q. R. Co.*, 2 Ill. 2d 606, 119 N.E. 2d 254; *Cosgrove v. Shusterman*, 129 Conn. 1, 26 A. 2d 471. The fact that the injured person placed himself in a dangerous position will defeat his recovery only when the negligence which injured him can reasonably be considered as having been included in the risk to which his position exposed him. *McFadden v. Pennzoil Co.*, 341 Pa. 433, 19 A. 2d 370.

"The fact that the plaintiff has failed to exercise reasonable care for his own safety does not bar recovery unless the plaintiff's harm results from a hazardous cause to which his conduct was negligent." Restatement, Torts, § 468.

Contributory negligence becomes a question of law only when plaintiff's evidence so clearly establishes it that no other reasonable inference may be drawn therefrom. *Dalrymple v. Sinkoe*, 230 N.C. 453, 53 S.E. 2d 437; *Graham v. R.R.*, 240 N.C. 338, 82 S.E. 2d 346. "Where the nature and attributes of the act relied on to show negligence contributing to the injury can only be correctly determined by considering all the attending and surrounding circumstances of the transaction, it

falls within the province of the jury to pass upon and characterize it, and it is not for the court to determine its quality as a matter of law." *Cooke v. Balt. Traction Co.*, 80 Md. 551, 31 A. 327; *Bethlehem Steel Co. v. Variety Iron and Steel Co.*, 139 Md. 313, 115 A. 59, 31 A.L.R. 1021; *Dennis v. Gonzales*, 91 C. A. 2d 203, 205 P. 2d 55. This was such a case. It was ably and fairly tried by both judge and counsel. The jury, after considering all the surrounding circumstances, found that plaintiff's injuries were proximately caused by the negligence of the defendant and that plaintiff did not by his own negligence contribute to them.

In the trial below we find

No error.