MARGARET JOLLY DRUM, JOHNNIE A. SHELTON, BY HER NEXT FRIEND, FLOYD K. DRUM, AND FLOYD K. DRUM, INDIVIDUALLY, v. JOHN BISANER, AND JAMES BISANER, T/A J. & J. ELECTRIC COMPANY.

(Filed 6 April, 1960.)

**1. Appeal and Error § 51—**

Upon appeal from denial of motions for judgment of involuntary nonsuit only the motion made at the close of all the evidence is to be considered. G.S. 1-183.

**2. Negligence § 24a—**

On motion to nonsuit in a negligence action the evidence must be considered in the light most favorable to plaintiffs and the motion overruled if the evidence, so considered, tends to support all essentials of actionable negligence.

**3. Statutes § 3—**

On July 13, 1957 the N. C. Building Code of 1953 had the force of law by virtue of G.S. 143-138(f).

**4. Negligence § 1—**

The violation of a statute which imposes upon a person a specific duty for the protection of others is negligence *per se.*

**5. Electricity § 7—**

The violation of the provisions of an electrical code in regard to the installation of electric wires, conduits, switches and terminal fittings, is negligence *per se,* the code having the force of law by virtue of statute.

**6. Negligence § 24c—**

Direct evidence of negligence is not required, but negligence may be

inferred from the facts and attendant circumstances, and if the facts proven establish negligence and proximate cause as the more reasonable probability nonsuit cannot be entered notwithstanding that the possibility of accident may also arise on the evidence.

**7. Same—**

Whether circumstantial evidence of negligence is sufficient to take the case out of the realm of conjecture and into the field of legitimate inference from established facts must be determined in relation to the attendant facts and circumstances of each case.

**7. Electricity § 7— Evidence held sufficient to support inference that fire resulted from negligent installation of electrical equipment.**

Plaintiffs' evidence tending to show that defendants, in installing an exhaust fan in plaintiffs' restaurant, violated the requirements of the applicable building code by failing to protect the non-metallic cable entering the metal electrical tubing at the fan housing with bushing to keep the insulated conductors from rubbing against the metal, that there was a space of about four feet between the ceiling of the kitchen and the rafters of the roof where the fan was installed, that the fan ran at irregular speeds, resulting in vibration, together with circumstantial evidence supporting the inference that the fire originated in the area of the fan housing and that a short-circuit occurred where the non-metallic cable entered the electrical metal tubing and that a fire broke out at this place, *is held* sufficient to be submitted to the jury on the question of whether the fire was proximately caused by defendants' negligence, nor is this result altered by testimony that the fan continued to run after the short-circuit, since the fan would continue to operate for a short period of its own momentum after the current had been cut off by the short-circuit.

APPEAL by defendants from *Crissman, J.,* August Civil Term, 1959, of GASTON.

Civil action to recover damages resulting from a fire allegedly caused by defendants' negligent installation of a fan over the roof of the kitchen of plaintiffs' restaurant.

Evidence was offered by both plaintiffs and defendants.

The court submitted, and the jury answered, these issues: "1. Was the property of the plaintiffs damaged by the negligence of the defendants, as alleged in the Complaint? ANSWER: Yes. 2. What damages, if any, are the plaintiffs entitled to recover of the defendants? ANSWER: $3,000.00."

Judgment for plaintiffs, in accordance with the verdict, was entered. Defendants excepted and appealed, assigning as error the denial of their motions for judgment of involuntary nonsuit.

*Hollowell & Stott and Hugh W. Johnston for plaintiffs, appellees.*
*Mullen, Holland & Cooke for defendants, appellants.*

BOBBITT, J.　The only motion for judgment of nonsuit to be considered is that made at the close of all the evidence. G.S. 1-183; *Spaugh v. Winston-Salem*, 249 N.C. 194, 105 S.E. 2d 610.

The question of law presented is whether the evidence, when considered in the light most favorable to plaintiffs, tends to support all essentials of actionable negligence. If so, it was sufficient for submission to the jury. *Lake v. Express, Inc.*, 249 N.C. 410, 106 S.E. 2d 518; *Murray v. Wyatt*, 245 N.C. 123, 95 S.E. 2d 541; *Mitchell v. Melts*, 220 N.C. 793, 18 S.E. 2d 406.

Uncontradicted evidence tended to show:

1. On Saturday, July 13, 1957, defendants installed an exhaust fan in plaintiffs' restaurant, "The New South Restaurant," located about two miles west of Gastonia on U. S. #29. The installation was made by defendant John Bisaner, assisted by an employee.

2. The exhaust fan was installed in the roof of the kitchen over the hood of the stove, to draw out the heat and fumes. A piece of one-half inch electrical metal tubing was connected by a lock nut to a disconnect switch located on the fan housing about twelve to eighteen inches above the roof. This electrical metal tubing, approximately two feet long, extended downward through a hole in the roof into the space of four feet between the ceiling of the kitchen and the rafters of the roof. An insulated #12 wire with two conductors, one for current and one for ground, was connected to the disconnect switch and run down through the electrical metal tubing to a toggle switch located on the kitchen wall. The wiring proceeded from the toggle switch down into the basement where it connected into a 30-amp. Square D fuse box.

3. Installation of the fan was completed about 8:20 a.m. and the fan was running when John Bisaner and his employee left the restaurant. The fan ran on 220 volts and turned 1140 revolutions per minute.

4. About 12:30 p.m., John Bisaner returned to the restaurant and repaired a wire leading to a switch that controlled the operation of the dough mixer.

Stinson, plaintiffs' cook, testified: "It (the fan) was running real fast; it was running awful fast; and after a while, it seemed like it would slow up a little bit. And after it slowed up, seemed like it'd jump back on running fast. . . . he (Mr. Bisaner) told me, said, 'I'll guarantee you'll be cool over the week-end, and I will be back Monday and complete the fan for you good.'"

According to plaintiffs' evidence: The gas stove was cut off at 2:00 p.m. About 3:30 p.m. when Stinson and Shelton (who worked "out front") were watching a ball game on television, a black streak

(jumping) came across the television screen. While Shelton was trying to fix the television, "there was a big pop in the kitchen." This is the substance of Stinson's testimony as to what he saw when he went into the kitchen: The fan was still running and jumping. Sparks were flying all over the fan and all over the kitchen. Fire was coming out of the hood (over the stove) into the kitchen. No other electrical equipment was operating.

As to conditions after the fire, there was evidence tending to show: The hood had dropped partly over the stove. The top of the hood was smoked black but underneath there was no smoke or fire damage. The most extensive damage was *over* the mixer and stove and about eight feet to "the side of the petition *(sic)* that goes into the kitchen." The sheathing and boards of the roof were burned black but not burned through.

Upon the foregoing evidence, we think it was permissible for the jury to infer that the fire originated in the area between the top of the hood and the fan.

Examination of the wiring, after the fire, disclosed that one of the conductors on the fan circuit had parted, leaving a "bead" on the end where it parted, rounded off as if melted. There was evidence that the wire was in two and beaded at the point "where the non-metallic cable entered the electrical metal tubing at the fan housing." There was expert testimony that the heat of the fire would not be intense enough to melt copper and that the bead was produced by a short-circuit within the wire. There was evidence that the short-circuit occurred at the lower end of the electrical metal tubing and that examination of all other wiring in the area failed to disclose that any other wire had parted or beaded.

To establish defendants' alleged negligence, plaintiffs offered evidence that there was no protective covering, such as a bushing, on the lower end of the electrical metal tubing, to protect the insulated conductors from rubbing against the metal. Indeed, John Bisaner's testimony contains an admission that this was true.

Plaintiffs offered in evidence the 1956 National Electrical Code. Plaintiffs had pleaded, *inter alia*, the provisions quoted below:

Article 300, section 3008: "Except as provided in section 3009, a box or terminal fitting having a separately bushed hole for each conductor shall be used wherever a change is made from . . . electrical metallic tubing . . . to open wiring . . ."

Article 300, section 3009: "A bushing may be used in lieu of a box or terminal fitting at ends of conduit or electrical metallic tubing where conductors leave the conduit or tubing behind a switchboard,

or where more than 4 conductors leave the conduit or tubing (under conditions not relevant here)."

The North Carolina Building Code of 1953, Article XVI, in pertinent part, provides: "Except as may be otherwise provided by rules promulgated by the Building Code Council, the electrical systems of a building or structure shall be installed in conformity with the 'National Electrical Code,' as approved by the American Standards Association and as filed in the office of the Secretary of State. The electric wiring of houses or buildings for lighting or for other purposes shall conform to the regulations prescribed by the organization known as National Board of Fire Underwriters."

G.S. 143-138(a), effective July 1, 1957, authorized the Building Code Council to prepare and adopt a "North Carolina State Building Code." G.S. 143-138(f), effective July 1, 1957, provides: "Effect upon Existing Laws—Until such time as the North Carolina State Building Code has been legally adopted by the Building Code Council pursuant to this article, the North Carolina Building Code adopted by the Council and the Commissioner of Insurance in 1953 shall remain in full force and effect. Such Code is hereby ratified and adopted."

Thus, on July 13, 1957, the date of the fire, the North Carolina Building Code of 1953, by virtue of G.S. 143-138(f), had the force of law. See *Lutz Industries, Inc., v. Dixie Home Stores*, 242 N.C. 332, 339-341, 88 S.E. 2d 333, and *In re O'Neal*, 243 N.C. 714, 92 S.E. 2d 189.

By adopting the North Carolina Building Code of 1953, the General Assembly "specifically set the standard of care in respect to the installing of the electrical system of a building and the electric wiring of buildings for lighting or for other purposes, and that is that the electrical system of a building shall be installed in conformity with the 'National Electrical Code' as approved by the American Standards Association and the electric wiring of buildings for lighting or for other purposes shall conform to the regulations prescribed by the organization known as National Board of Fire Underwriters, . . ." *Lutz Industries, Inc., v. Dixie Home Stores, supra,* discussing the adoption of the North Carolina Building Code of 1936 by Chapter 280, Session Laws of 1941.

"It is well settled law in this jurisdiction, that when a statute imposes upon a person a specific duty for the protection of others, that a violation of such statute is negligence *per se.*" *Lutz Industries, Inc. v. Dixie Home Stores, supra.* Since Article 300, sections 3008-3009, of the National Electrical Code, for the reasons stated, had the force and effect of a statute, the failure to use a box or terminal fitting or bushing where the conductors left the electrical metal tubing was

negligence *per se.* Moreover, an expert witness testified: "Ordinarily, the end of a piece of electrical metal tubing of that kind would have a bushing on it."

There was evidence, that, due to excessive heat in the attic during the summer, the wood in the attic was dry, and that the fire occurred on a hot July day. Too, it may be inferred that vibrations of the electrical metal tubing were caused by the speed and irregular operation (jumping) of the fan.

Was there sufficient evidence to support a finding that such negligence of defendants proximately caused the fire? As to this, an expert witness, based upon facts in evidence, testified that in his opinion the vibrations of the fan and of the electrical metal tubing caused the insulation on the open wiring as it left the lower end of the electrical metal tubing to wear or rub off from contact with the metal of the tubing; that this caused the short-circuit; and that the short-circuit would generate sufficient heat to ignite combustible material.

"It is very generally held that direct evidence of negligence is not required, but the same may be inferred from facts and attendant circumstances, and it is well established that if the facts proved establish the more reasonable probability that the defendant has been guilty of actionable negligence, the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence." *Hoke, J. (later C.J.),* in *Fitzgerald v. R. R.,* 141 N.C. 530, 534, 54 S.E. 391. To like effect: *Austin v. Austin, ante,* 283, 113 S.E. 2d 553; *Frazier v. Gas Co.,* 247 N.C. 256, 100 S.E. 2d 501; 38 Am. Jur., Negligence § 334; 65 C.J.S., Negligence § 244(a), pp. 1089-1091. Cases involving proof of the origin of a fire by circumstantial evidence include the following: *McRainey v. R. R.,* 168 N.C. 570, 84 S.E. 851; *Lawrence v. Power Co.,* 190 N.C. 664, 130 S.E. 735; *Small v. Utilities Co.,* 200 N. C. 719, 158 S.E. 385; *Peterson v. Power Co.,* 183 N.C. 243, 111 S.E. 8; *Ashford v. Pittman,* 160 N.C. 45, 75 S.E. 943; *Simmons v. Lumber Co.,* 174 N.C. 220, 93 S.E. 736, and cases cited. See, also, 65 C.J.S., Negligence § 244(a), pp. 1099-1100.

Whether the circumstantial evidence is sufficient "to take the case out of the realm of conjecture and into the field of legitimate inference from established facts," must be determined in relation to the attendant facts and circumstances of each case. *Parker v. Wilson,* 247 N.C. 47, 53, 100 S.E. 2d 258, and cases cited; *Smith v. Hickory, post,* 316, 113 S.E. 2d 557. The applicable rules are easy to state, difficult to apply.

After careful consideration, we reach the conclusion that, when the evidence is considered in the light most favorable to plaintiffs,

and all legitimate inferences are drawn therefrom in plaintiffs' favor, it was for the jury to determine whether the fire was proximately caused by defendants' negligence.

Defendants contend, *inter alia,* the evidence shows the short-circuit occurred after the fire was under way. This contention is based largely on Stinson's testimony that the fan was running and jumping when he went to the kitchen; on evidence that, upon occurrence of the short-circuit, the current to run the fan was cut off; and on Stinson's testimony that either ten or five minutes elapsed between the appearance of the streak on the television screen and the time he heard the "big pop" and went to the kitchen. However, the evidence provides no satisfactory answer to these questions: What caused the streak across the television screen? Did the short-circuit occur when the streak crossed the television screen or when the "big pop" occurred? Moreover, as to the time interval between the streak and the "big pop," Stinson's testimony was at best an estimate. Immediately after the streak, Shelton got up to try to fix the television; and the "big pop" was heard while Shelton was so engaged. Too, while the evidence tended to show the current to the fan would be cut off by the short-circuit, it would seem that the fan would operate for some period thereafter by reason of its own momentum. These were matters to be resolved by the jury.

Defendants, contending the fire was of undetermined origin, have forcefully contested each premise upon which plaintiffs' case rests. While conceding the force of their contentions, our conclusion is that the case was for jury consideration and determination.

No error.