CARL A. LINDSTROM AND VIRGINIA K. LINDSTROM, PLAINTIFFS v. WILLIAM J. CHESNUTT, JANE C. CHESNUTT, AND WILLIAM J. CHESNUTT, INC., DEFENDANTS AND THIRD PARTY PLAINTIFFS v. COMFORTEMP AIR CONDITIONERS, INC., THIRD PARTY DEFENDANTS

No. 7214SC281

(Filed 28 June 1972)

1. Negligence § 29; Sales § 17— negligent installation of furnace — insufficiency of evidence

In an action to recover damages for defects in a house constructed by corporate defendant, evidence of the original defendants was insufficient to support their claim that the third party defendant was guilty of joint and concurring negligence in improperly installing the furnace system so that it vibrated severely and caused girders to misalign, uneven settling and subsequent seepage of water on the inside of the foundation walls.

2. Evidence § 47— expert testimony — invasion of province of jury

In this action to recover damages for defects in a house purchased from defendant builder, testimony by an expert in structural engineering that faulty construction caused sagging of floors and certain cracking in the home did not invade the province of the jury, since the testimony could only have been considered by the jury as a statement of the witness' opinion.

3. Damages § 13; Negligence § 27; Sales § 14— defects in construction of house — offer to repurchase — irrelevancy

In an action to recover under theories of negligence and breach of warranty for defects in a house purchased from defendant builder, defendant's evidence of offers to repurchase the property from plaintiffs was irrelevant.

4. Negligence § 37; Sales § 18— instructions — N. C. Building Code — alternative materials or methods — authority of Building Inspectors

In an action to recover damages for defects in a house purchased from defendant builder, the trial court properly instructed the jury that the N. C. Residential Building Code does not give Building Inspectors discretion to permit alternative materials or methods of construction where the Code is specific as to the materials or type of construction required, but gives Inspectors discretion to permit materials or methods equivalent to the requirements of the Code only where the Code itself places discretion in the Inspectors or does not specifically set forth the materials or methods to be used.

5. Negligence § 1— violation of building code

A violation of the N. C. Building Code is negligence *per se*.

6. Master and Servant § 22— defects in construction — negligence of subcontractor — independent contractor — liability of prime contractor

In an action to recover damages for defects in a house purchased from defendant builder, the trial court properly refused to instruct

the jury that the builder-vendor would not be liable for any negligent acts or omissions on the part of subcontractors who were independent contractors.

7. Sales § 17— construction and sale of house — express warranty — breach — sufficiency of evidence

In this action to recover damages for defects in a home purchased from defendant builder, the evidence was sufficient to allow the jury to find an express warranty as to the quality of materials and workmanship and a breach thereof.

APPEAL by defendants William J. Chesnutt and William J. Chesnutt, Inc., from *McKinnon, Judge,* 7 September 1971, Civil Session, Superior Court, DURHAM County.

In August 1967 plaintiffs purchased a house which had been constructed by the corporate defendant upon a lot owned by the individual defendants in the City of Durham. The construction was nearing completion when the plaintiffs agreed to buy the house. After plaintiffs moved in the house certain defects became noticeable. This action was instituted 28 February 1969 asking for damages for breach of warranty or, in the alternative, for rescission of the contract. The defendants filed a third party complaint asking for contribution from Comfortemp Air Conditioners, Inc. The original defendants subsequently filed a motion for summary judgment. As the result of a hearing on the motion, plaintiffs elected to proceed on the theory of damages and abandon the rescission theory. At trial all defendants moved for a directed verdict. The motions were renewed at the end of all the evidence and allowed as to Jane C. Chesnutt and the third party defendant, Comfortemp Air Conditioners, Inc. The jury answered issues as to breach of warranty and negligence in favor of plaintiff and returned a verdict of $13,250. Defendants William J. Chesnutt and William J. Chesnutt, Inc., appealed.

*Haywood, Denny and Miller, by George W. Miller, Jr., for plaintiff appellees.*

*Powe, Porter and Alphin, P.A., by Willis P. Wichard and James G. Billings, for appellants.*

*Brooks and Brooks, by Eugene C. Brooks III, for third party defendant, Comfortemp Air Conditioners, Inc., appellee.*

MORRIS, Judge.

[1] By their sixth assignment of error, appellants challenge

Lindstrom v. Chesnutt

the correctness of the court's allowing third party defendant's motion for directed verdict at the close of all the evidence. The original defendants filed a third party complaint alleging that if the third party plaintiff should be found to be negligent in construction of the house, "the third party defendant was guilty of joint and concurring negligence, which combined with that of the third party plaintiff in proximately causing the plaintiff's injury, in that improper and faulty installation of the furnace system by the third party defendant resulted in severe vibration" which shook the foundation walls causing girders to misalign, uneven settling and subsequent seepage of surface water on the inside of the foundation walls. Third party plaintiff asked for judgment against third party defendant for contribution in the amount of one-half of the damages and costs awarded to the plaintiff.

There was evidence that the furnace was a horizontal warm air flow through gas fired furnace typical of the type used when installation is to be in a crawl space, as this one was. There was also evidence that it was installed upon concrete blocks which were sitting upon the ground and that this was standard procedure in the area. There was also evidence that manufacturer's instructions provided that the recommended procedure when the furnace was to be located in a crawl space was that the installation be on a concrete pad one or two inches thick. The building code did not require installation of such a furnace to be on a concrete pad. The evidence further tended to show that in early September 1967 the furnace came on and the house filled with smoke, and that in early October the furnace "blasted occasionally whenever it lit." Third party defendant was called, and the repairman adjusted the pilot. The blasting continued, and third party defendant continued to respond to calls in an effort to correct the problem. In November, third party defendant replaced the furnace's burner and no further difficulty was experienced. The blasts were not of equal severity. The vibrations from the blasts shook the house, rattled doors and windows, and "the floors were noticeably raised." Plaintiff testified: "All the defective construction I noticed occurred after the furnace blew up."

We find no evidence of negligence on the part of third party defendant in the installation of the furnace. We said in

*Jenkins v. Starrett Corp.*, 13 N.C. App. 437, 444, 186 S.E. 2d 198 (1972):

> "Inasmuch as the burden of establishing negligence is on the plaintiff, evidence which raises only a *conjecture* of negligence may not properly be submitted to the jury. To hold that evidence that a defendant *could have been* negligent is sufficient to go to a jury, in the absence of evidence, direct or circumstantial, that such a defendant *actually was* negligent, is to allow the jury to indulge in speculation and guesswork. (Citations omitted.)"

We agree with the trial tribunal that third party plaintiff failed to prove its claim for relief as alleged in its third party complaint. Assignment of error No. 6 is, therefore, overruled.

[2]    Assignment of error No. 1 is directed to the court's refusal to grant defendants' motions to strike certain portions of the testimony of Henry Griset, testifying for plaintiff as an expert.

The testimony is as follows:

"Q. And do you have an opinion as to whether or not the type of construction that you observed as you have already testified to could have caused that cracking?

A. Yes, sir.

(Objection—overruled)

Q. All right, sir, now—

A. I didn't answer that. I said I had an opinion.

Q. What is your opinion?

A. Yes, sir, it did cause it.

(Objection and Motion to Strike—Denied)"

and

"Q. Should the jury find that the house was constructed in a manner that you have indicated, do you have an opinion as to whether or not that type of construction could have caused the sagging floors in the home?

(Objection—overruled)

A. The faults in the construction could have caused them— did cause them—yes, not could, but did.

(Motion to Strike—denied)."

Defendants contend that the witness's answers invaded the province of the jury; that they were statements of evidential facts in issue beyond the knowledge of the witness under the guise of an expert opinion. This witness's testimony consumed some 36 pages of the record. Without objection, he was found to be an expert in the field of structural engineering. He had testified at length about his personal examination of the structure on several occasions, the first of which was on 23 May 1968, at which time plaintiffs had been in the house only nine months. There had already been evidence of defective construction. This same witness had previously testified without objection: "Now, my inspection revealed no place where there were three nails that is required by the Code. The joint (sic) here must be nailed to the plate, too, and also revealed that these joists were spilt here (indicating), and they were not adequately joined together. They were just—just laid there, so that any such force as this *would be transmitted* in deflections here (illustrating on board). Again, if they are mild forces and ordinary forces the result *would be* finish damage. If they were severe enough, a severe windstorm, they *would* result in structural collapse of portions of this." (Emphasis supplied.) And: "Assuming the jury finds that the joists under the floor were humped or dropped down or deflected down, I have an opinion as to whether or not that condition could have caused the floors themselves to have dropped down. My opinion is *that did happen,* the deflection, but also I think some of the misalignment of the floors was built in, that is when the house was built, the prime structure of the floor joists were not perfectly level when the floor was laid on it." This witness had also previously testified that "[t]he materials in this house were poor and so was the workmanship." Assuming that the court's ruling in two instances in this witness's testimony, to which defendants take exception, constitute technical error, we do not perceive that defendants were prejudiced. We think the testimony was a statement of his opinion, and the jury could only have considered it as such. "Some positive statements can, in the nature of things, be only expressions of opinion." *Teague v. Power Co.,* 258 N.C. 759, 765, 129 S.E. 2d 507 (1963). See *Bruce v. Flying Service,* 234 N.C. 79, 66 S.E. 2d 312 (1951), and *Cranston Print Works v. Public Service Co. of N. C.,* 291 F. 2d 638 (4th Cir. 1961), where similar testimony was held admissible. This assignment of error is overruled.

[3] Defendants' third assignment of error is to the court's excluding testimony of defendant William J. Chesnutt with respect to his offers to repurchase the premises from plaintiffs and similar testimony sought to be elicited from plaintiff Carl Lindstrom on cross-examination, included in the record on voir dire examination. While the complaint did contain allegations and a prayer to have the contract and deed rescinded, plaintiffs were required to make an election and elected to proceed to trial on the theory of negligence and breach of warranty for which they sought monetary damages. We fail to see the relevancy of the excluded testimony to this theory. Nor do we find merit in the contention that defendants were prejudiced in that the evidence should have been admitted on the question of damages. Defendant testified as to his opinion of the values of the property and had every opportunity to present the opinion of anyone else as to the market values. His contention that plaintiff had testified that he had requested defendant Chesnutt to take the house back and was refused and defendants should be allowed to use the testimony for purposes of impeachment is also without merit. That request was made prior to the institution of this action, and no further conversation was had between plaintiffs and defendant Chesnutt. The excluded negotiations were between counsel for the parties and occurred some time later. It seems clear that the evidence, if admitted, would have been prejudicial to plaintiffs in the theory of the trial because the purport of the evidence would be that if defendants had made such an offer and it was refused, they should be relieved of further obligation and plaintiffs should not be allowed to recover damages. The evidence was irrelevant and properly excluded.

By their ninth and twelfth assignments of error, defendants contend the court erred (1) in refusing to instruct the jury in accordance with tendered instructions with respect to interpretation of § 33 of the North Carolina Uniform Residential Building Code, which section, in pertinent part, is as follows:

"In interpreting the requirements or provisions of this Building Code, the decision of the Building Inspector shall be final. An appeal from the decision of the Building Inspector may be taken to the courts as provided by law.

Lindstrom v. Chesnutt

'The Building Inspector shall have the authority to permit the use of materials or methods of construction not specifically set forth within the Code. Provided however, any such alternate materials or methods of construction is proved to the satisfaction of the Building Inspector to be at least the equivalent of the requirements prescribed by this Code for safey, strength, quality and effectiveness including fire resistance.' ";

and (2) in instructing the jury on other sections of the Code.

[4, 5] Defendants' tendered instructions would have interpreted § 33 of the Code as giving "the building inspector discretionary authority to permit the use of alternative materials or alternative methods of construction that are not specifically set forth within the code, so long as the building inspector is of the opinion that the alternative materials or methods are at least equivalent of (sic) the requirements specifically set forth in the code for safety, strength, quality and effectiveness, including fire resistance. Thus, if you find that alternative materials or methods of construction were used which were not specifically set forth within the North Carolina Uniform Residential Building Code, and if you find that the building inspector approved such alternate materials or methods of construction, then there would not be a violation of the North Carolina Uniform Residential Building Code with respect to each alternative use of materials or method of construction so approved by the building inspector."

The court charged the jury as follows:

"This provision of the N. C. Residential Building Code gives the Building Inspector discretionary authority to permit the use of alternative materials or alternative methods of construction that are not specifically set forth in the Code, if he is of the opinion that the alternative methods and materials are at least equivalent of the requirements set forth in the Code for safety, strength, quality and effectiveness.

However, it does not allow him to permit violations of the Building Code where the Code is specific as to the materials or type of construction required. So in areas where the Building Code itself places discretion in the Building Inspector as to what materials are used, or

methods are not specifically set forth, then his decision and permission to allow alternative materials or methods at least as good as the Building Code would be permitted; but where the Code specifically says certain materials shall be used, he would not have the discretion to permit others to be used."

In support of their position, defendants cite no authority save the testimony of the building, plumbing, and electrical inspectors to the effect that they interpreted the Code as giving them wide latitude. The building inspector testified: "If there was a section that specifically set forth what was to be done, that is not what I required in every case . . . I worked under the assumption that I had the right under the code to base my interpretations on independent judgment." If this be true, Article 9, Chapter 143, General Statutes, authorizing and establishing a Building Code Council empowered and directed to prepare and adopt a North Carolina State Building Code in accordance with legislative directives contained in Article 9, is indeed a completely useless piece of legislation. Both contractors and home owners would be at the mercy of building inspectors, some of whose requirements might overly protect the owner while some might dangerously shield the contractor or builder. We note that the publication of the Code by the N. C. Building Code Council refers to it as being minimum requirements. To give the Code the interpretation proposed by defendants could have the result of abrogating the purposes of adopting the Code; viz, "to establish minimum standards, materials, designs, and construction of buildings for the safety of the occupants, their neighbors, and the public at large." *Walker v. City of Charlotte*, 276 N.C. 166, 170, 171 S.E. 2d 431 (1970). The N. C. Building Code has the force of law, *Drum v. Bisaner*, 252 N.C. 305, 113 S.E. 2d 560 (1960); any person adjudged to have violated the Code shall be guilty of a misdemeanor, G.S., 143-138(h); and a violation thereof is negligence *per se, Jenkins v. Electric Co.,* 254 N.C. 553, 119 S.E. 2d 767 (1961); *Drum v. Bisaner, supra; Lutz Industries, Inc. v. Dixie Home Stores*, 242 N.C. 332, 88 S.E. 2d 333 (1955). Upon application of these principles to the portions of the charge of the court challenged by these assignments, we conclude that the court properly instructed the jury upon the evidence presented.

[6]   Defendants also tendered a requested instruction directing the jury to determine whether the masonry subcontractor, the

plumbing subcontractor, the electrical subcontractor and the heating and air conditioning subcontractor were independent contractors; defining independent contractors; and instructing the jury that if they should find that such a relationship existed, the defendants would not be liable for any negligent acts or omissions of any of their subcontractors. The tendered instruction was refused and this refusal is assigned as error (assignment of error No. 10). The court gave the following instruction:

> "As contractor and seller of the house, Mr. Chesnutt and his company would be responsible for any actions of his subcontractors either in failing to use good quality materials or to construct in a workmanlike manner, or any negligent conduct on their part, if he knew or reasonably should have known as general contractor or builder of the house of those conditions. He is not to be responsible for any such things which a reasonable man in his position as builder and contractor of the house would not have discovered, but the mere fact that work was done by a subcontractor does not relieve the contractor of responsibility if he by the exercise of reasonable care knew or should have known of the existence of those conditions."

Defendants by their answer did not set up a defense based on the liability of independent contractors but simply denied plaintiffs' allegations as to their negligence. In *Gaither Corp. v. Skinner,* 238 N.C. 254, 77 S.E. 2d 659 (1953), plaintiff had entered into a contract with defendant for the construction of a building in accordance with plans and specifications and for an agreed price. Plaintiff subsequently sued defendant alleging faulty and defective materials used by defendant in construction of the roof in breach of the contract, resulting in continued leaking, and demanded damages sufficient to replace the roof with one in accordance with the plans and specifications. Defendant denied the allegations and alleged that the roof construction had been let to a subcontractor and that if the subcontractor had failed to construct it in accordance with the specifications, which was denied, the subcontractor was responsible to plaintiff and to defendant. Defendant asked that the subcontractor be made a party and that if plaintiff recovered damages from defendant, that defendant recover damages over against the subcontractor. In affirming the trial court's dismissal of the subcontractor the Court said:

"The plaintiff has elected to pursue his action against the contractor with whom he contracted in order to recover damages for an alleged breach of that contract, and plaintiff should be permitted to do so without having contested litigation between the contractor and his subcontractor projected into the plaintiff's lawsuit. *Montgomery v. Blades,* 217 N.C. 654, 9 S.E. 2d 397.

The exact question here presented does not seem to have been heretofore decided by this Court. However, in *Board of Education v. Deitrick,* 221 N.C. 38, 18 S.E. 2d 704, where the general contractor, who had been sued for damages for using green and defective lumber in the building, moved to make the lumber dealer from whom he had obtained the material a party, it was held that the motion was properly denied. Under the facts of that case there was no privity between plaintiff and the lumber dealer, nor were the contractor and subcontractor joint tortfeasors."

This assignment of error is overruled.

[7] By assignment of error No. 11, under which defendants group 43 exceptions, defendants contend that the court erred in submitting instructions to the jury on the theory of breach of warranty. We find no merit in defendants' position that the evidence was insufficient to allow this issue to be submitted to the jury. On this question the evidence, taken in the light most favorable to plaintiffs, tends to show the following: When plaintiffs inspected the house, it was about 90% completed. Defendant told them he was "a builder of high quality homes" and that his smaller homes such as the one plaintiffs purchased were of the same quality as the larger ones he built. "He told us that this home was to be a Parade home. This meant to me then that he was a member of National Home Builders Association of which I was familiar, because during Parade of Home Week National Home Builders Association writes articles and extols their membership as highly honest people, that their membership complies with a rigid code of ethics. So I was quite impressed that this was a Parade home. Parade homes are put on display on Parade of Homes week by members of this National Home Builders Association. He told us that this house was intended for display but it had not been finished in time. He also told us at that time that he was licensed to build homes

in North Carolina to $75,000 and went on to tell us that the other builder in the neighborhood was licensed to build homes to $35,000." Defendant offered to and did take plaintiffs to a home in Hope Valley in the $75,000 class. This home had not been completed and was not as far along in construction as the house plaintiffs purchased. Some of the framework was exposed. Defendant told plaintiffs that "the quality of the home in Hope Valley was exactly the same as the quality of the home" they bought "in materials and workmanship." "The lumber was nice and clean, very little knots. These are the things that, of course, I would look for. The saw cuts were very neat, the nails were driven very nicely. He guided us to the kitchen area and pointed out the high quality. It looked high quality to me in the kitchen in the way of the kitchen cabinets and the like. He was very proud of the family room in this home. It had a large fireplace, very wide, very impressive looking and on the side with bookshelves, and the workmen had done an excellent job there. I was satisfied at that time that Mr. Chesnutt was indeed a builder of quality homes of quality material and he took pride in what he was doing." Plaintiff Lindstrom further testified: "The statements and representations which he made influenced our decision to purchase the home." Defendant testified "I may have indicated to them that I was a quality builder and had a good reputation. I don't recall. I can't remember everything I said five years ago. I would like to have sold the house to them, sure."

It appears that many jurisdictions have abolished the concept of caveat emptor and adopted the concept of implied warranty of fitness in the transaction for the sale of a completed house between builder-vendor and buyer. It is certainly true that the purchase of a home is not an everyday transaction for the average family, and, in many instances, is the most important transaction of a lifetime. As early as 1964 the Supreme Court of Colorado stated:

"We hold that the implied warranty doctrine is extended to include agreements between builders-vendors and purchasers for the sale of newly constructed buildings, completed at the time of contracting. There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied

warranties that the home was built in workmanlike manner and is suitable for habitation." *Carpenter v. Donohoe,* 154 Colo. 78, 83-84, 388 P. 2d 399, 402 (1964).

An excellent discussion of the current trend may be found in *Theis v. Heuer,* _____ Ind. _____, 280 N.E. 2d 300 (1972). We do not reach this problem, however, because we hold that the evidence in this case was sufficient to allow, but not compel, the jury to find an express warranty and a breach thereof.

Finally, by assignments of error Nos. 2, 4, and 7, defendants challenge the rulings of the court in denying defendants' motions for directed verdict at the close of plaintiffs' evidence and again at the close of all the evidence, and in denying defendants' motions for judgment notwithstanding the verdict and for new trial. Defendants make no argument in their brief in support of these assignments. We think it unnecessary to discuss further the questions raised. This case was ably tried and ably argued and presented on appeal. The record consisted of 461 pages, and there were some 150 exhibits introduced. The trial lasted a full week, and the jury apparently had little or no difficulty in reaching a verdict for the plaintiffs. We find nothing in the record before us sufficiently prejudicial to require a new trial.

Affirmed.

Judges VAUGHN and GRAHAM concur.