IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-127

Filed: 7 April 2015

Lincoln County, No. 08 CVS 1960

THE ESTATE OF NATHAN RICHARD COPPICK, by its ADMINISTRATOR RICHARD G. COPPICK, Plaintiff,

v.

HOBBS MARINA PROPERTIES, LLC; HOBBS WESTPORT MARINA, LLC; CHAMPIONSHIP CHARTERS, INC.; JOSEPH CLIFTON CHAMPION; AND PETROLEUM EQUIPMENT & SERVICE, INC., Defendants.

Appeal by defendant Petroleum Equipment and Service, Inc., from judgment entered 11 April 2013 by Judge Forrest D. Bridges in Lincoln County Superior Court. Heard in the Court of Appeals 12 August 2014.

> *Sigmon, Clark, Mackey, Hutton, Hanvey & Ferrell, PA, by Forrest A. Ferrell and Jason White, for plaintiff-appellee.*

> *Horack, Talley, Pharr & Lowndes, P.A., by Kimberly Sullivan, for defendant-appellant.*

BRYANT, Judge.

Where the evidence was sufficient to support the jury verdict finding that the death of Nathan Coppick was caused by defendant's negligence and properly based on the doctrine of negligence *per se*, we find no error in the trial court's denial of defendant's motion for judgment notwithstanding the verdict or new trial. We also find no error in the trial court's assessment of interest on the compensatory damage award in accordance with North Carolina General Statutes, section 24-5.

On 27 March 2013, a jury trial commenced in Lincoln County Superior Court, the Honorable Forrest Donald Bridges, Judge presiding. Plaintiff, The Estate of Nathan Richard Coppick, by its Administrator Richard G. Coppick, had filed suit alleging negligence against defendants Hobbs Marina Properties, LLC; Hobbs Westport Marina, LLC; Championship Charters, Inc.; Joseph Clifton Champion; and Petroleum Equipment & Service, Inc. Prior to trial, plaintiff voluntarily dismissed its claim against defendants Championship Charters, Inc., and Joseph Clifton Champion. The record is silent as to the outcome of the proceedings against Hobbs Marina Properties, LLC, and Hobbs Westport Marina, LLC. But, at trial, the only defendant plaintiff proceeded against was Petroleum Equipment & Service, Inc. (hereinafter "defendant").

The evidence at trial tended to show that on 10 June 2008, Nathan Coppick was working at the Hobbs Westport Marina in Denver, North Carolina. Shortly before four o'clock that afternoon, the Championship II, an eighty-foot-long charter vessel with two fuel tanks (one twenty gallon tank, one ten gallon tank) was positioned at Hobbs Westport Marina for refueling. The gas pump was activated, and recorded video surveillance admitted as substantive evidence and played for the jury showed Nathan pulling a gasoline hose toward the gasoline receptacle located at the rear of the Championship II. Nathan then walked away from the gasoline receptacle and headed toward the front of the boat. According to the clock shown on the recorded video surveillance, after six minutes had elapsed, a vapor cloud was visible on the

port side of the vessel in "real close proximity" to the fueling area. Then there were two explosions. The first explosion occurred as Nathan was stepping off a ladder from the second deck onto the center of the stern (the back of the boat). When the second explosion occurred, fire engulfed the stern of the Championship II. Nathan was killed instantly.

Evidence showed that defendant provided the fuel dispensing system equipment, including nozzles, used at the marina. The nozzle on the hose Nathan used to refuel the Championship II was a non-pressure-activated nozzle with a hold-open latch. Richard Strickland, Chief Fire Code Consultant with the North Carolina Department of Insurance, Office of State Fire Marshal, and Rebecca Warr, Safety Compliance Officer with the North Carolina Department of Labor, testified that use of gasoline nozzles with a hold-open latch at a marina was a violation of the North Carolina Fire Code and OSHA regulations.

The jury found defendant negligent and liable for Nathan Coppick's death. The jury awarded plaintiff $1,500,000.00, and the trial court entered judgment in accordance with the jury award. Defendant filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial. The trial court denied the motion. Defendant appeals.

---

In its appeal from the denial of its motion for JNOV and alternatively, new trial, defendant contends the trial court erred in denying the motion. Defendant also

challenges the trial court's instructions on negligence and negligence *per se*, the trial court's failure to instruct on insulating negligence, certain evidentiary rulings of the trial court, and the award of prejudgment interest.

"A motion for JNOV is essentially a renewal of a motion for a directed verdict. The standard to be employed by a trial judge in determining whether to grant a judgment notwithstanding the verdict is the same standard employed in ruling on a motion for a directed verdict." *State Properties, LLC v. Ray*, 155 N.C. App. 65, 72, 574 S.E.2d 180, 185—86 (2002) (citations omitted).

> In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant. The non-movant is given the benefit of every reasonable inference which may legitimately be drawn from the evidence, resolving contradictions, conflicts, and inconsistencies in the non-movant's favor. A motion for directed verdict should be denied if more than a scintilla of evidence supports each element of the non-moving party's claim.

*Trantham v. Michael L. Martin, Inc.*, ___ N.C. App. ___, ___, 745 S.E.2d 327, 331 (2013) (quotations and citations omitted).

*Negligence / Negligence Per Se*

Defendant argues that plaintiff failed to prove the elements of negligence and, thus, the trial court erred in denying defendant's motion for JNOV. Defendant contends plaintiff failed to establish that defendant owed Nathan Coppick a duty of

care, and failed to put forth evidence that defendant installed the nozzle used by

Nathan at the time of his death. We disagree.

> In order to set out a *prima facie* claim of negligence against [the defendant], [the] plaintiff was required to present evidence tending to show that (1) [the defendant] owed a duty to [the] plaintiff; (2) [the defendant] breached that duty; (3) such breach constituted an actual and proximate cause of plaintiff's injury; and, (4) [the] plaintiff suffered damages in consequence of the breach.

*Cucina v. City of Jacksonville*, 138 N.C. App. 99, 102, 530 S.E.2d 353, 355 (2000)

(citation omitted). However, where there is a violation of a safety statute, the

traditional role of the jury in determining whether plaintiff has set forth a prima facie

case of negligence is superseded, and defendant-violator is considered to be negligent

as a matter of law, or negligent *per se*.

> The statute prescribes the standard, and the standard fixed by the statute is absolute. The common law rule of ordinary care does not apply – proof of the breach of the statute is proof of negligence. The violator is liable if injury or damage results, irrespective of how careful or prudent he has been in other respects.

*Cowan v. Transfer Co. & Carr v. Transfer Co.*, 262 N.C. 550, 554, 138 S.E.2d 228, 231

(1964).

> The general rule in North Carolina is that the violation of a public safety statute constitutes negligence *per se*. A public safety statute is one imposing upon the defendant a specific duty for the protection of others. Significantly, even when a defendant violates a public safety statute, the plaintiff is not entitled to damages unless the plaintiff belongs to the class of persons intended to be protected by the statute, and the statutory violation is a proximate

cause of the plaintiff's injury.

*Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (citations and quotations omitted).

Defendant's duty of care argument, which in effect challenges the duty imposed pursuant to the public safety statute in question—here, the N.C. Building Code— must fail. *See Stultz v. Thomas*, 182 N.C. 470, 473, 109 S.E. 361, 362 (1921) (holding that "[a] failure to discharge an affirmative duty imposed by law has been held by us, in a number of cases, to constitute an act of negligence *per se* . . . . In fact, a breach of a legal duty, or a duty imposed by law, comes within the very definition of negligence[.]" (citations omitted)).

Pursuant to General Statutes, section 143-138, "[t]he [Building] Code may regulate activities and conditions in buildings, structures, and premises that pose dangers of fire, explosion, or related hazards. Such fire prevention code provisions shall be considered the minimum standards necessary to preserve and protect public health and safety . . . ." N.C. Gen. Stat. § 143-138(b1) (2013). "The N.C. Building Code has the force of law[,] . . . and a violation thereof is negligence *per se.*" *Lindstrom v. Chesnutt*, 15 N.C. App. 15, 22, 189 S.E.2d 749, 754 (1972) (citations omitted). "[T]he Code imposes liability on any person who constructs, supervises construction, or designs a [structure] or alteration thereto, and violates the Code such that the violation proximately causes injury or damage." *Olympic Products Co. v. Roof Sys., Inc.*, 88 N.C. App. 315, 329, 363 S.E.2d 367, 375 (1988) (citation omitted).

In the instant case, the specific activity subject to regulation by the Code was the use of certain nozzles containing a hold-open latch. "Dispensing of Class I, II or IIIA liquids into the fuel tanks of marine craft shall be by means of an approved-type hose equipped with a listed automatic-closing nozzle *without a latch-open device*." N.C. Fire Prevention Code § 2209.3.3 (2002) (emphasis added). As a producer, installer and maintainer of fuel dispensing systems which are placed on premises that pose a danger of fire or explosion, defendant is subject to the duty imposed under the code.

Defendant argues that it could not be found liable based on negligence *per se* absent a showing of a violation of the code and a showing that defendant knew or should have known of the violation. Plaintiff, however, points to evidence in the record that defendant admitted to being a general contractor licensed by the State of North Carolina and, as such, is required to have knowledge of the North Carolina Building Code before obtaining a general contractor license. *See* N.C. Gen. Stat. § 87-10(b) (2013) ("Application for license [for General Contractors]" "(b) The Board shall conduct an examination . . . of all applicants for license to ascertain . . . (ii) the qualifications of the applicant in reading plans and specifications, knowledge of relevant matters contained in the North Carolina State Building Code . . . ; (iii) the knowledge of the applicant as to the responsibilities of a contractor to the public and of the requirements of the laws of the State of North Carolina relating to contractors [and] construction . . . .").

Despite defendant's contention that the Code does not specify who is responsible for compliance with the section that regulates nozzles and hoses at marine fueling stations, plaintiff's evidence showed that the responsibility for complying with the Code fell upon the marina owner and upon the person or entity who installed the nozzles. Plaintiff's evidence, as presented by Chief Fire Code Consultant for the North Carolina Department of Insurance Office of State Fire Marshal Richard Strickland, showed that the Code placed on defendant a duty to provide to marinas the approved type of hose equipped with the proper nozzles, and that providing a prohibited nozzle constitutes negligence *per se*.

> Q. So the law of our state, then, would require as of 2002 that you cannot place a nozzle on a fuel-dispensing system at a marina that contains a hold-open latch; is that correct?
>
> A. That is correct.
>
> Q. And to do so would be illegal in that it violates the North Carolina State Building Code, correct?
>
> A. Yes, it would be in violation of [the] North Carolina State Building Code.

In support of its argument that the trial court erred in denying defendant's motion for JNOV and, alternately, a new trial, defendant contends that plaintiff failed to establish defendant installed the gasoline nozzle Nathan used when re-fueling the charter boat, the Championship II. Plaintiff responds that the evidence presented at trial established defendant was the only company, contractor, or

supplier to provide and maintain the fuel dispensing equipment. Evidence in the record supports plaintiff's response that defendant was the sole supplier and installer of fuel dispensing equipment to the marina, including the types of nozzles alleged to be in violation of the statute.

For example, Nick Harmon, who worked at the marina in the summer of 2005, 2006, and 2007 as assistant dock manager, then as dock manager, testified that nozzles containing hold-open latches[1] were used "very often" in fueling the boats. With six fueling points and multiple boats coming in, a person could start refueling one vessel, then move to a second boat and refuel it. Harmon testified that nozzles containing hold-open latches were used to refuel the Championship II, as well as other boats. Harmon recalled defendant installing and maintaining the nozzles containing hold-open latches: "I knew [defendant's] mechanics and techs very well" but knew of no other company that provided maintenance for the fuel dispensers.

Further, defendant made the following pertinent factual admissions which were allowed as evidence before the jury: that on 27 July 2006, defendant installed five new gasoline nozzles on the fuel dispensers at the marina; that the dispensers were "automatic-closing nozzles which contained hold-open latches"; that defendant's records showed that defendant had performed maintenance/service work on the fuel dispensing system at the marina every year since 1998; and, that the nozzle on the

---

[1] Nozzles containing hold-open latches allow gasoline to flow continuously without the necessity of an attendant applying pressure to the nozzle.

fuel dispenser involved in the 10 June 2008 fire and explosion on the Championship II would dispense 10 gallons of fuel per minute if set on full speed with the hold-open latch engaged.

This evidence, presented by plaintiff at trial, tended to show that defendant installed and maintained fuel delivery equipment, including gasoline nozzles that contained hold-open latches, which was in violation of the Fire Code referenced above. Such a violation, plaintiff contends, constitutes negligence *per se*.

Defendant, at trial and now on appeal, urges our review of contradictory testimony regarding the type of nozzle used by Nathan and the installation of the nozzle. However, for purposes of ruling on a motion for JNOV, the trial court must resolve all conflicts, contradictions, and inconsistencies in the light most favorable to the non-movant, here, plaintiff. *See Trantham*, ___ N.C. App. at ___, 745 S.E.2d at 331. Taken in the light most favorable to plaintiff and giving plaintiff the benefit of every reasonable inference, there was sufficient evidence presented to the jury for the jury to find that defendant installed and performed routine maintenance on the fuel dispensing system at Hobbs Westport Marina, including changing the fuel dispensing nozzles.

This evidence was sufficient to support the trial court's instruction on negligence *per se* which followed the pattern jury instructions and properly stated the law as to negligence and negligence *per se*. Therefore, this evidence was sufficient to prove that defendant was subject to the safety statute at issue in this litigation and

that defendant's actions were in violation of the statute and, thus, sufficient to prove liability for negligence *per se*, provided there was proximate cause. *See Stein*, 360 N.C. at 326, 626 S.E.2d at 266 ("The general rule in North Carolina is that the violation of a public safety statute constitutes negligence *per se*. . . . [The plaintiff may recover if he] belongs to the class of persons intended to be protected by the statute, and the statutory violation is a proximate cause of the plaintiff's injury." (citations omitted)). Therefore, we review defendant's arguments regarding proximate cause.

*Proximate Cause*

Defendant contends plaintiff failed to establish that any conduct of defendant proximately caused the explosion on 10 June 2008. We disagree.

"The test of proximate cause is whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant." *Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 431—32, 677 S.E.2d 485, 504 (2009) (citation omitted). "Actual causation may be proved by circumstantial evidence, and this principle is equally as true in fire cases as in any other tort liability case." *Collins v. Caldwell Furniture Co.*, 16 N.C. App. 690, 694, 193 S.E.2d 284, 286 (1972) (citation omitted). "[W]hat is the proximate cause of an injury is ordinarily a question for the jury." *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 235, 311 S.E.2d 559, 566 (1984) (citation and quotations omitted); *see also Jenkins v. Helgren*, 26 N.C. App. 653, 658, 217 S.E.2d 120, 123 (1975) ("Certainly it is both probable and foreseeable that fire will be the consequence of a serious fire hazard.

Beyond question the fumes which defendants here allowed to accumulate constituted a serious fire hazard as a direct consequence of which the damaging fire occurred. One whose negligence creates the hazard of fire cannot escape responsibility merely because the source of the triggering spark may not be shown." (citations omitted)).

Defendant states that no expert testified as to the cause or origin of the explosion, and that plaintiff relied entirely upon circumstantial evidence. However, expert testimony was not required to establish the cause or origin of the explosions. *See Associated Indus. Contr'rs, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 411—12, 590 S.E.2d 866, 871 (2004) ("It is well settled that the standard of care must be determined by expert testimony unless the conduct involved is within the common knowledge of laypersons. Where, as in the instant case, the service rendered does not involve esoteric knowledge or uncertainty that calls for the professional's judgment, it is not beyond the knowledge of the jury to determine the adequacy of the performance." (citation omitted)).

Here, plaintiff put forth sufficient evidence, both direct and circumstantial, as to the cause or origin of the explosion. For example, the nozzle and hose used to refuel the Championship II just prior to the explosion was plaintiff's Exhibit 38D. Exhibit 38D, along with the remaining nozzles taken from the marina, utilized a "hold-open latch." When refueling a boat, marina dockhands could "engage the hold-open latch and then go about doing other business[,]" because the hold-open latch is supposed to disengage and stop the flow of fuel when the gasoline reaches the top of the tank

being filled. However, one marina customer described an overflow of fuel from the gasoline tank on his boat as he refueled on 7 June 2008—three days before the explosion. "I looked over the side and gas was coming back out of the boat -- or out of the spigot. So I jumped out of the boat, flipped the [dispenser] off, the gas, so it stopped."

> Q. How much gas do you think roughly spilled out?
>
> A. Well, I mean, I don't know. Usually I didn't fill up unless the tank was close to empty . . ., but I would say at least a couple gallons. Maybe not quite that much.

The nozzles used at the marina had three speeds; "the fastest was 10 gallons a minute, the middle one was about 5 gallons a minute, and the lowest one was 2 gallons a minute."

> Q. . . . [F]rom the time that nozzle was put in and switched on until the explosion, how long [was that]?
>
> A. It appeared to be about six minutes.
>
> . . .
>
> Q. So just using simple math, that would have meant that 60 gallons of gas was pumped during that time?
>
> . . .
>
> Q. . . . So if [the nozzle] worked, it might have shut off [when the tank was full], but if it didn't work, if it pumped that whole time, 6 times 10 is 60 gallons of gas would have been pumped into whatever tank that nozzle was in?

A.    It could have.

At least one defense witness testified that the fuel nozzle used to refuel the Championship II had not "clicked off" prior to the explosion. Also, evidence at trial showed that the manufacture date on the nozzle, Exhibit 38D, matched the month defendant invoiced the marina for a standard nozzle, indicating that defendant sold the nozzle that was used by Nathan Coppick to refuel the Championship II on 10 June 2008.

In addition to the testimony and exhibits, the jury was able to view as substantive evidence the video recording of events leading up to the explosions, and to decide, along with other evidence, whether plaintiff had established proximate cause. This evidence, taken in the light most favorable to plaintiff, was sufficient to enable the jury to find that the gas dispenser nozzle used in refueling the Championship II failed to shut-off after the tank reached maximum capacity, causing excess gasoline to spill out into the surrounding water. Further, from this evidence the jury could find that a vapor cloud appeared shortly before the excess gasoline spilled into the water and then ignited, resulting in two explosions and a fire which engulfed the stern of the Championship II and killed Nathan Coppick. On this record there was sufficient evidence of negligence *per se*, including evidence of proximate cause, to survive a motion for JNOV and, alternatively, a new trial. *See Trantham*,

\_\_\_ N.C. App. at \_\_\_, 745 S.E.2d at 331 (citations and quotations omitted).

Defendant's arguments are overruled.

### *Jury Instructions*

Based on our preceding analysis, we overrule defendant's contentions that the

trial court erred by instructing the jury on negligence and negligence *per se*. However,

while we disagree with defendant, we nevertheless review defendant's argument that

the trial court erred in denying its request for an instruction on insulating negligence.

> On appeal, this Court considers a jury charge contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by an omitted instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.

*Boykin v. Kim*, 174 N.C. App. 278, 286, 620 S.E.2d 707, 713 (2005) (citations and

quotations omitted).

> An efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted.

*Hairston,* 310 N.C. at 236, 311 S.E.2d at 566—67 (citation omitted). "Insulating negligence means something more than a concurrent and contributing cause. It is not to be invoked as determinative merely upon proof of negligent conduct on the part of each of two persons, acting independently, whose acts unite to cause a single injury." *Id.* at 236, 311 S.E.2d at 566 (citations omitted).

Defendant contends it presented sufficient evidence as to the negligence of others to support giving the instruction on insulating negligence. Defendant argues that its evidence showed, for example: that the owner/operator of the Championship II allowed the vessel to be refueled with the boat systems on; that the marina officers instructed marina employees to use the fuel dispensing nozzles containing hold-open latches; that the marina cashier failed to oversee the fuel dispensing process; and that the marina changed fuel dispensing nozzles and failed to test them.

While defendant points to conduct noted above which may have contributed to the cause of the 10 June 2008 explosion, defendant fails to direct our attention to conduct which reasonably may have been viewed as "a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question," *id.* at 236, 311 S.E.2d at 566, that is, the explosion and fire that led to the death of Nathan Coppick. From our independent review of the record, we are unable to find any conduct that supersedes the original conduct of defendant where such conduct constituted a violation of a safety statute and which proximately caused the death of Nathan Coppick. *See id.* at 236, 311 S.E.2d at 566—67.

Therefore, we hold that the trial court properly denied defendant's request for an instruction on insulating negligence. Accordingly, defendant's argument is overruled.

### *Evidentiary Rulings*

Defendant argues that the trial court erred in evidentiary rulings and other rulings, resulting in a manifest abuse of discretion. Defendant contends the trial court erred in allowing witnesses to testify to damages he or she sustained as a result of Nathan Coppick's death, allowing two witnesses to "vouch for other testimony that [had] been given," admitting a photograph of Nathan Coppick's body where it was found after the explosion, and overruling defendant's objection to plaintiff's cross-examination of defendant's president. While defendant acknowledges that, standing alone, the contested admissions would likely not amount to reversible error, defendant nevertheless contends that the cumulative effect of these rulings was prejudicial. Defendant further argues that the admission of the contested evidence resulted in confusion of the jury and prejudice to defendant requiring a new trial.

However, other than defendant's assertions, we see no evidence in the record that the trial court's rulings resulted in confusion of the jury and/or undue prejudice to defendant such that a new trial is required. Accordingly, we overrule this argument.

### *Prejudgment Interest*

Defendant argues that the trial court erred in its award of prejudgment interest based on the full amount of compensatory damages awarded, $1,500,000.00. Defendant contends prejudgment interest should be calculated based only on the portion of compensatory damages for which defendant is responsible. We disagree.

As defendant concedes, our Supreme Court previously addressed this issue in *Brown v. Flowe*, 349 N.C. 520, 507 S.E.2d 894 (1998). In *Brown*, the Court directly rejected the defendant's argument that a trial court should subtract the amount of settlements received from joint tortfeasors from the total compensatory award before calculating the prejudgment interest. *Id.* at 526, 507 S.E.2d at 898. The Court reasoned that this proposed method was "prohibited by the plain language of N.C.G.S. § 24–5, which requires calculation of prejudgment interest on the entire compensatory-damages verdict." *Id.*

To calculate prejudgment interest when judgment is rendered against one, but not all, tortfeasors, our Supreme Court outlined the following process:

> (1) adding prejudgment interest at the legal rate to the entire compensatory damages award as N.C.G.S. § 24–5(b) requires, (2) adding interest at the legal rate to the settlement sum from the date of settlement until the date of judgment, and (3) subtracting the second calculation from the first to determine the amount of compensatory damages [the] defendant owes to [the] plaintiff.

*Id.* at 527, 507 S.E.2d at 898; *see also Boykin*, 174 N.C. App. at 288, 620 S.E.2d at 714 (holding that pre-judgment interest is to be awarded before a set-off is given for the settlement amount).

Here, the trial court applied prejudgment interest at a rate of eight percent (8%) per annum to the total $1,500,000.00 compensatory award beginning 9 June 2010, the date the claim was filed, through 11 April 2013, the date of entry of judgment, less any credits to which defendant may be entitled by law. In a post-trial hearing, the trial court explained that to calculate the share of the total award due from each party, the trial court would follow the following formula: "[First,] [a]dding prejudgment interest at the legal rate to the entire compensatory damages. . . . [Second], adding interest at the legal rate to the settlement sum from the date of settlement until the date of judgment and [third,] subtracting the second calculation from the first." This is in accordance with the formula espoused by our Supreme Court in *Brown*. Accordingly, we overrule defendant's argument and find no error in the judgment and award of the trial court.

NO ERROR.

Chief Judge McGEE and Judge STROUD concur.