David SPRINGER et al., Appellants,

v.

**JOSEPH SCHLITZ BREWING COMPANY, Appellee.**

No. 73–2360.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1974.

Decided Jan. 14, 1975.

Jonathan R. Harkavy, Greensboro, N. C. (Norman B. Smith, Smith, Carrington, Patterson, Follin & Curtis, Greensboro, N. C., on brief), for appellants.

W. P. Sandridge, Winston-Salem, N. C. (Charles F. Vance, Jr., Winston-Salem, N. C., on brief), for appellee.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

BUTZNER, Circuit Judge:

This North Carolina diversity case raises the question of the liability of an industry to downstream riparian owners when its wastes overload a city's treatment facilities and cause water pollution. The plaintiffs, David and Diana Springer, own an interest in a large farm on the Yadkin River. Seeking an injunction and compensatory and punitive damages, they contend that, beginning in late 1969, wastes from a new brewery owned by Joseph B. Schlitz Brewing Company in Winston-Salem, North Carolina, overloaded the city's sewage treatment plant, causing it to pollute the Yadkin and interfere with their riparian rights. The Springers introduced evidence, which, viewed in the light most favorable to them, showed that Schlitz knew, or in the exercise of reasonable care should have known, that the city sewage plant lacked the capacity to treat the brewery's waste; that in discussions with the city, Schlitz underestimated the quantity and harmfulness of the waste; and that the company violated the city sewage ordinance. The evidence also established that in the spring and summer of 1970, after Schlitz reached full production, inadequately treated sewage from the overloaded plant caused six unprecedented fish kills and otherwise impaired the quality of the Yadkin River.

At the close of the Springers' case, the court directed a verdict for Schlitz on the ground that North Carolina absolves the user of a municipal sewer system of liability for the city's failure to adequately treat its sewage. We reverse because we believe the case is controlled by exceptions to North Carolina's rule of immunity.

I

In North Carolina, a riparian landowner has a right to the agricultural, recreational, and scenic use and enjoyment of the stream bordering his land, subject, however, to the rights of upstream riparian owners to make reasonable use of the water without excessively diminishing its quality. Though he does not own the fish in the stream, the riparian owner's rights include the opportunity to catch them. Interference with riparian rights is an actionable tort, and a riparian owner may join several polluters as joint tort-feasors. *See generally,* Aycock, Introduction to Water Use Law in North Carolina, 46 N.C.L. Rev. 1, 11–13 (1967).

Nevertheless, an industry that uses a municipal sewage system to dispose of its waste is not liable to a riparian landowner for the pollution caused by the city's failure to provide adequate treatment. Quoting from 43 C.J. 1158, the North Carolina Supreme Court stated in Hampton v. Spindale, 210 N.C. 546, 548, 187 S.E. 775, 776 (1936):

"[T]he inhabitants of a city who invoke its power to construct and control a sewer, and who use the sewer . . . for the purpose and in the way prescribed by law, are not liable jointly with the city for the damages which result to third persons from the negligence of the city in the construction, management, or operation of the sewer."

In the only other North Carolina case to consider the point, the court justified

the rule by emphasizing the inability of a private sewer user to control a city's treatment of · its wastes after they entered the system. Clinard v. Town of Kernersville, 215 N.C. 745, 748, 3 S.E.2d 267, 270 (1939). The district court considered itself bound by these decisions to enter a directed verdict for Schlitz.

The Springers claim that their proof is sufficient to invoke exceptions to the general rule of immunity. Specifically, they contend that Schlitz should be held liable if it violated the city sewage ordinance, or if Schlitz knew, or should have known, of the inability of the city to adequately treat the brewery's wastes. Since no North Carolina court has considered these exceptions, we must determine the common law of the state by examining the rationale for the established rule, developments on this point in other states, and analogous areas of the state's common law. *See* Bernhardt v. Polygraphic Company of America, Inc., 350 U.S. 198, 208, 76 S.Ct. 273, 100 L.Ed.

199 (1956) (Frankfurter, J., concurring); Corbin, The Laws of the Several States, 50 Yale L.J. 762, 770 (1941). We will treat the exceptions on which the Springers rely in Parts II and III of this opinion.[1]

## II

In February 1970 the City of Winston-Salem enacted a comprehensive sewage ordinance to take effect in May. The ordinance requires every user of industrial sewers to have a discharge permit.[2] Users may discharge only wastes containing 2500 ppm BOD or less,[3] and they are forbidden to release sewage containing a wide variety of dangerous or difficult-to-treat substances.[4] The ordinance imposes surcharges for BOD pound loadings caused by a concentration above 300 ppm.[5] Originally, it allowed the city to furnish advice and technical assistance, but it did not provide for variances or exemptions.[6] By state law, its violation is a misdemeanor.[7]

1. The Springers also assert that Schlitz both defrauded the city and conspired with it to violate the state's water quality regulations. The district court properly dismissed these claims.

2. Winston-Salem Code of Ordinances § 23–4.

3. Winston-Salem Code of Ordinances § 23–3(1)(a) provides as follows:

   "[A]ny waters or wastes discharged by any person, which have the following characteristics, and which do not have any of the characteristics prohibited by Sec. 23–2, may be discharged into the public sanitary sewers:

   (a) a five-day B.O.D. not exceeding 2,500 ppm. . . ."

   § 23–1(2) defines B.O.D.:

   "B.O.D. (denoting Biochemical Oxygen Demand) shall mean the quantity of oxygen utilized in the biochemical oxidation of organic matter under standard laboratory procedure in five (5) days at 20° C, expressed in . . . parts per million by weight. B.O.D. is a measure of the polluting strength of wastes."

   In other words, BOD is not a separate substance but a measure of the ability of decomposing sewage to remove dissolved oxygen from the water.

   BOD has two important polluting effects, depending on the manner in which it decays. It first removes dissolved oxygen necessary for fish and other aquatic life from the stream, causing fish kills and other biological changes. Once the dissolved oxygen has

been exhausted, the remaining BOD undergoes septic decomposition, which produces slime, scum, gas, and fecal odors.

4. Winston-Salem Code of Ordinances § 23–2(2).

5. Winston-Salem Code of Ordinances § 23–12.

   The pound loading is the actual amount of BOD in a given volume of sewage (the hydraulic load) that the treatment plant must remove. It is obtained by multiplying the volume of sewage in millions of gallons per day by the weight of a gallon of water (8.34 pounds) and the concentration of BOD in parts per million. For example, the Winston-Salem treatment plant was designed to treat a flow of 18 million gallons per day containing 500 ppm of BOD, or 75,060 pounds of BOD per day (18 million gallons/day x 500 parts/million x 8.34 pounds = 75,060 pounds/day).

6. Winston-Salem Code of Ordinances § 23—4(d).

   In 1972 the ordinance was amended to provide for variances. The new sections allow the Superintendent of Water and Sewers *to* grant a conditional permit to a noncomplying firm if the firm submits an acceptable schedule of compliance and agrees to follow it. Failure to adhere to the schedule may lead to the exaction of a performance bond and ultimately to revocation of the permit and forfeiture of the bond. *See* Winston-Salem Code of Ordinances § 23–4(e)–(h).

7. North Carolina Gen.Stat. § 14–4.

Schlitz's effluent contained more than 2500 ppm BOD until April 1971. Beginning in May 1970, the city billed, and Schlitz paid, all BOD surcharges. The brewery and other industries, however, were allowed to operate in violation of the ordinance and without permits as long as they submitted schedules for compliance and conformed to them. It received its permit, one of the first issued to any industry, in May 1971.

The violation of a municipal sewage ordinance which is intended to protect downstream riparian owners can subject an industrial sewage source to private civil liability. Hampton v. Spindale, 210 N.C. 546, 548, 187 S.E. 775, 776 (1936), expressly restricts freedom from liability to those persons who use the sewers "in the way prescribed by law." [8] Although this is dictum, it is consistent with the rationale for the private user's immunity. When an industry turns over the control of its sewage to the city, it can reasonably expect that the city will safeguard riparian property by effective treatment.[9] But it is not reasonable for an industry to expect a city to safely treat prohibited sewage. Consequently, the reason for granting immunity does not then apply.

This reading of *Hampton* conforms to North Carolina's general law regarding the effect of regulatory legislation on civil liability. The state is firmly committed to the proposition that the "violation of a statute designed to protect persons or property is a negligent act, and if such negligence proximately causes injury, the violator is liable." Murray v. Bensen Aircraft Corp., 259 N.C. 638, 131 S.E.2d 367 (1963) (federal aircraft safety statute); *accord,* Bell v. Page, 271 N.C. 396, 156 S.E.2d 711 (1967) (town ordinance regulating private swimming pools). The statute or ordinance, serving as a legislative declaration of a standard of care, creates a private right not to be harmed by its violation. Bell v. Page, *supra*; King v. Pope, 202 N.C. 554, 163 S.E. 447 (1932).

Schlitz's failure to obtain a permit until May 1971 does not afford the Springers a ground for recovery. The permit does not protect riparian owners. It is only an instrument of the city's enforcement program, and its absence does not pollute the stream. Moreover, the ordinance does not explicitly forbid the discharge of wastes containing more than 2500 ppm BOD. The ordinance is a criminal statute which must be construed in the defendant's favor in civil proceedings as well as in criminal ones. Hinson v. Dawson, 241 N.C. 714, 86 S.E.2d 585 (1955). Since the discharge of more than 2500 ppm BOD is not a crime, it does not constitute negligence *per se.*

In contrast, the discharge of sewage prohibited by Section 23–2(2) is a crime, and under North Carolina law it is actionable if it proximately causes damage to riparian property. Section 23–2(2) states in part:

"(2) Except as hereinafter provided, it shall be unlawful for any person to discharge or cause to be discharged any of the following described materials, waters, liquids, or wastes into any public sanitary sewer:

. . . . .

"(g) Liquid wastes containing any toxic or poisonous substances in sufficient quantities to (i) interfere with the biological processes used in a sewage treatment plant, or (ii) which, in combination with other liquid wastes, upon passing through a sewage treatment plant will be harmful to persons, livestock, or aquatic life utilizing the receiving streams into which water from a sewage treatment plant is discharged."

In order to establish that Schlitz's violation of the ordinance was

8. *Accord,* Weingand v. City of North Platte, 108 Neb. 17, 187 N.W. 90 (1922).

9. A town is liable for pollution it causes by dumping inadequately treated sewage. Clinard v. Town of Kernersville, 215 N.C. 745, 3 S.E.2d 267 (1939); *see* Aycock, Introduction to Water Use Law in North Carolina, 46 N.C. L.Rev. 1, 11–13 (1967).

negligence, the Springers would have to prove that the brewery wastes had the characteristics forbidden by Section 23–2(2). Viewed in the light most favorable to them, the evidence showed that the brewery's wastes had a toxic or poisonous effect on bacteria that are essential to the sewage treatment process. The evidence also showed that after passing through the plant the wastes were harmful to aquatic life in the receiving stream.[10] The jury should therefore be allowed to determine whether or not the discharge violated the ordinance. If it did, this was negligence, and the jury should then decide whether it proximately caused damage to the Springers' property.

▮▮▮▮▮ Schlitz argues that its discharge of brewery wastes is not actionable because the city's officials did not require compliance with the ordinance until May 1971, except for the payment of surcharges. This contention lacks merit. Section 23–4(d) of the ordinance authorized the water and sewer officials to:

"consult with and furnish technical assistance and advice to industrial users of the city's sewerage system in order to assist them in devising procedures and constructing equipment to reduce or eliminate from industrial wastes objectionable characteristics or properties which may not otherwise be discharged into the public sanitary sewers under Section 23–2."

While this provision recognized that compliance was not instantly attainable and allowed city officials to furnish technical assistance and advice, its terms gave them no power to affect the rights of third parties.[11] A statute protecting life or property creates a private right not to be harmed by its violation unless the legislature specifically provides otherwise. Carr v. Murrows Transfer, Inc., 262 N.C. 550, 138 S.E.2d 228 (1964). Public officials have no more power to alter these private rights than the legislature chooses to give them. Swaney v. Peden Steel Co., 259 N.C. 531, 542, 131 S.E.2d 601, 609 (1963); Kotkins v. Seattle, 119 Wash. 590, 206 P. 11 (1922).

It is argued, however, that the ordinance should not be read literally because the only reasonable construction is one which would allow city officials to dispense with its requirements. While it is true that the city's director of water and sewers believed that immediate, rigorous enforcement would be undesirable because it would "shut down just about every industry in Winston-Salem," there is no conflict between the public interest in keeping a factory open and the private right to recover damages for pollution. The two may be reconciled by requiring the source of pollution to pay damages while allowing it to operate. See Boomer v. Atlantic Cement Co., 26 N.Y.2d 219, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970). Since the plain language of the ordinance does not authorize city officials to dispense with its requirements, their actions could not affect the Springers' rights. Weingand v. City of North Platte, 108 Neb. 17, 187 N.W. 90, 91 (1922); Kotkins v. Seattle, 119 Wash. 590, 206 P. 11, 13 (1922).[12]

---

10. Dissolved BOD is removed from sewage by exposing it to decay causing bacteria under controlled conditions. In Winston-Salem this was done in trickling filters, which consist of beds of crushed stone coated with bacterial slime. Excessive pound loadings of BOD cause the slime to be stripped from the filters, rendering them almost useless until a fresh growth of bacteria forms. Thus a large source of BOD may interfere with the treatment capacity of the entire system. Excess acidity or alkalinity also interferes with the operation of trickling filters by killing the bacteria. Excessive amounts of BOD, alone or in combination with other wastes, can kill fish and other aquatic life by depleting the oxygen in the receiving stream.

11. In 1972 the ordinance was amended to explicitly authorize the city to suspend the requirements of § 23–2(2). Winston-Salem Code of Ordinances § 23–4(e)–(h); see note 6 supra.

12. In Hampton v. Spindale, 210 N.C. 546, 548, 187 S.E. 775, 776 (1936), the Court relied in part on the statement of the rule of immunity found at 43 C.J. 1158. The same chapter of the treatise states that a property owner's violation of a municipal drainage ordinance constitutes negligence although excused in advance by an administrative officer.

474

■ In addition, paying effluent surcharges did not relieve Schlitz from having to obey the rest of the ordinance. The city levies these charges "to cover some of the cost to the city of treating such wastes."[13] They begin not at 2500 ppm but at 300 ppm,[14] the approximate dividing line between domestic and industrial strength sewage. The charges are enumerated in the ordinance section which sets other fees, not in the one which describes prohibited uses. They are revenue measures rather than substitutes for civil liability.

### III

■ As an alternative ground of recovery, the Springers argue that Schlitz should be held liable if it knew, or in the exercise of reasonable care should have known, that the city could not adequately treat the brewery's waste. The validity of this claim depends on an analysis of the underlying reasons for the general rule of immunity.

In absolving the user of a municipal sewage system from liability, North Carolina follows the leading case of Carmichael v. Texarkana, 116 F. 845 (8th Cir. 1902). See Hampton v. Spindale, 210 N.C. 546, 187 S.E. 775, 776 (1936); Clinard v. Town of Kernersville, 215 N.C. 745, 748, 3 S.E.2d 267, 270 (1939).[15] Carmichael involved a suit by a riparian owner against a city and its inhabitants. The court affirmed the dismissal of the complaint against the inhabitants, holding that the city alone was responsible for the nuisance created by its sewer system. It analogized the problem to a more familiar area of vicarious responsibility—the employer's liability for the torts of an independent contractor:

"If [the inhabitants] had taken their own sewage to the creek, and poured it into its waters above the premises of the complainants, they would undoubtedly . . . have been liable . . . . On the other hand, if they had made an agreement with an independent contractor . . . to remove all their sewage from their premises to a place where, and in a manner in which, it could do no unnecessary injury to any one, and their contractor had carelessly deposited it . . . in the stream above [complainants'] property, the [inhabitants] would not have been liable for these wrongful acts of their contractor. Their relation to the city and to its negligence is not of a different character." 116 F. at 849.

The city, in the court's view, undertook to dispose of the residents' wastes in a nuisance free manner, and they in turn consented to such conditions as the city might put on the use of the sewers.

Although there was no actual contract of employment,[16] Carmichael correctly analyzed the relation between the inhabitants and the city. The city controls the choice of methods that will be used to achieve the desired result, and the individual sewer user lacks authority to control the city's performance. The Supreme Court of North Carolina accepted this view in Clinard v. Town of Kernersville, 215 N.C. 745, 748, 3 S.E.2d 267, 270 (1939), where it said:

13. Winston-Salem Code of Ordinances § 23–12(c).

14. According to the evidence, the conventional value for the strength of untreated household sewage is approximately 275 ppm BOD.

15. Hampton also cites Kraver v. Smith, 164 Ky. 674, 177 S.W. 286 (1915), in which a distiller was absolved from liability despite the claim that it had discharged sewage which it should have known the town pumping station could not handle. Kraver provides no rationale for this holding other than the general rule. Its summary rejection of the claim is not persuasive.

Other cases recognizing the Carmichael rule are Athey v. Tennessee Coal, Iron & R. R. Co., 191 Ala. 646, 68 So. 154 (1915); Ratzlaff v. Franz Foods of Arkansas, 250 Ark. 1003, 468 S.W.2d 239 (1971); and Johnson v. Kraft–Phenix Cheese Corp., 19 Tenn.App. 648, 94 S.W.2d 54 (1935); cf. People v. City of Los Angeles, 83 Cal.App.2d 627, 189 P.2d 489 (1948); Weingand v. City of North Platte, 108 Neb. 17, 187 N.W. 90 (1922).

16. Cf. Ratzlaff v. Franz Foods of Arkansas, 250 Ark. 1003, 468 S.W.2d 239 (1971), in which an industry that had contracted with a city not to overload its treatment plant with BOD was held liable to a riparian owner.

"The [polluter] has no control over the disposition of the water. It is disposed of under the sole supervision and control of the defendant Town. Under such circumstances no liability is imposed upon [the polluter] for any damage caused to the property of the plaintiffs on account of the emptying of such dye water into Abbotts Creek. . . . Carmichael v. Texarkana . . . ."

The liability of the user of a municipal sewer system therefore appears to be limited in the same way as the liability of an independent contractor's employer.

A North Carolina employer is not liable for his contractor's negligence when he lacks the power to control the contractor's actions.[17] He remains, though, responsible for negligent acts within his own control even when the contractor is also at fault. State Highway Commission v. Diamond Steamship Transportation Corp., 226 N.C. 371, 38 S.E.2d 214 (1946); Evans v. Rockingham Homes, Inc., 220 N.C. 253, 17 S.E.2d 125 (1941). Since the selection of the contractor is within the employer's control, "if it appears that the employer knew, or by the exercise of reasonable care might have ascertained that the contractor was not properly qualified to undertake the work, he may be held liable for the negligent acts of the contractor." Page v. Sloan, 12 N.C.App. 433, 183 S.E.2d 813, 817

(1971), aff'd, 281 N.C. 697, 190 S.E.2d 189 (1972).

The owner of a large industrial source of sewage, particularly one only planned or under construction, is similarly situated.[18] A manufacturing company is in a position to know enough about its own operations to understand the nature of its wastes and the problems of treating them. If it has not yet selected a plant site, it may have a choice among cities and disposal systems. It may also be large enough to pre-treat or properly dispose of its own sewage. When the company represents a desirable source of jobs and tax revenues, the local authorities can be expected to provide it with technical information about the municipal sewers. In brief, a large industrial sewer user can make an informed decision whether to use a city sewer system to render its wastes nuisance free.

According to the Springers' evidence, Schlitz, which has more than a century of experience in brewing beer, considered several cities in the Southeast before selecting Winston-Salem for a brewery site. As part of its investigation, the company requested information about the city's sewage facilities, and its representatives toured the treatment plant. Had the company inquired, it would have learned that the plant was operating at or over its daily capacity of 18 million gallons of sewage containing 76,000 pounds of BOD. The city assured

---

**17.** When an activity is dangerous although reasonable care is exercised, i. e. inherently dangerous, the employer remains liable for resulting injuries even when the work is done by an independent contractor. Greer v. Callahan Construction Company, 190 N.C. 632, 130 S.E. 739 (1925).

One state has held that the source of high BOD wastes remains liable for treatment in all circumstances under the theory that they are inherently dangerous substances which must be rendered safe before they are allowed to leave his land. Klassen v. Central Kansas Cooperative Creamery Ass'n, 160 Kan. 697, 165 P.2d 601 (1946); see Fletcher v. Rylands, L.R. 1 Ex. 265 (1866); 2 Harper & James, The Law of Torts § 14.4, at 798–99 n. 25 (1956). But see Restatement, Torts § 520; Prosser, Handbook of the Law of Torts 525–530 (3rd ed. 1964). In view of our

disposition of the case, we find it unnecessary to pursue this theory.

**18.** We express no opinion about the possible liabilities of a large industrial sewage source already connected to a sewer system which subsequently becomes overloaded through the acts of others.

Moreover, our decision is not intended to alter the liabilities of the ordinary sewer user. Most of the inhabitants of a city, including all of the households, lack the skill and resources to learn the characteristics of their own sewage or the city's ability to treat it. Even if they know that the sewer system is inadequate, they have no practical alternative but to continue using it. The general rule of immunity therefore protects them when they knowingly use an overloaded system, as long as they do so in a lawful manner.

Schlitz that it would adequately treat its wastes after Schlitz advised the city to expect 15,000 pounds of BOD per day. Before the brewery had been open a year, however, it was discharging 56,000 pounds of BOD per day into a system which had previously reached its 76,000 pound capacity. Brewery wastes are known by sanitary engineers to be difficult to treat and to interfere with the treatment of other wastes because of their high concentration of BOD and fluctuating alkalinity.[19]

These facts disclose that Schlitz knew the characteristics of its own sewage [20] and that it exercised control over its selection of a site and of the sewage system which would dispose of its waste. The evidence also indicates that Schlitz could not rely on the city's acceptance of its sewage, because it had not furnished the city accurate information. Finally, the proof supports an inference that Schlitz knew, or in the exercise of reasonable care should have ascertained, that the city could not adequately treat its brewery wastes. The jury might reasonably have decided that Schlitz negligently selected the city of Winston-Salem to treat its sewage. Drawing upon North Carolina's common law principles governing the liability of an employer of an independent contractor, we conclude that Schlitz is not, as a matter of law, immune from liability. Accordingly, on remand, the district court should submit the issue of Schlitz's liability on the Springers' alternative theory.

### IV

The record discloses that after the 1970 fish kills, Schlitz expended more than $1,300,000 for sewage treatment facilities, and it is now in compliance with the effluent quality standards of the city ordinance. The city has doubled the size of its treatment plant, and it can now properly treat the waste from the brewery. In view of this evidence, it is unlikely that an injunction is appropriate under North Carolina law. Cf. Morgan v. High Penn Oil Co., 238 N.C. 185, 77 S.E.2d 682, 690 (1953); Rhyne v. Flint Mfg. Co., 182 N.C. 489, 109 S.E. 376 (1921); see generally, Aycock, Introduction to Water Use Law in North Carolina, 46 N.C.L.Rev. 1, 14 (1967).

On remand, the court should instruct the jury that the Springers cannot recover if the evidence discloses only that Schlitz's waste, after passing through the Winston-Salem treatment plant, polluted the Yadkin, killed fish, and caused other damage to the Springers' riparian property. Under North Carolina's general rule of immunity, Schlitz cannot be held liable if the evidence discloses no more than those facts.

The jury should be told that in order for the Springers to recover they must prove by a preponderance of the evidence that Schlitz violated Winston-Salem's sewage ordinance by discharging sewage prohibited by § 23–2(2) or that Schlitz knew, or in the exercise of reasonable care should have ascertained, that the city's treatment plant could not adequately treat its sewage. In either event, the Springers must also prove that the brewery's waste proximately caused their injury; that is, that it was foreseeable that Schlitz's waste, alone, or in conjunction with other waste, would damage the Springers' riparian property. This outline of the elements of the plaintiffs' claim, of course, is not intended to preclude the court from charging the jury about defenses Schlitz may present when the case is fully tried.

---

19. See note 10 supra.

20. The district court excluded testimony which disclosed that sewage from a brewery Schlitz had recently built in Longview, Texas, greatly exceeded its expected effluent strength and volume, causing a treatment plant similar to Winston-Salem's to malfunction. On remand, the district court should reexamine its ruling in the light of this opinion. The evidence appears admissible to show Schlitz's knowledge about the characteristics of its brewery's sewage and the problems that it could cause. It should be admitted unless its probative value is offset by the prejudice it will generate. McCormick, Evidence § 185, at 438–40 (2d ed. 1970); Stansbury, North Carolina Evidence § 80 (1946).

We find no error in the district court's other rulings on the admission of evidence.

The judgment of the district court is vacated, and this case is remanded for a new trial. The Springers shall recover their costs.

WIDENER, Circuit Judge (concurring and dissenting):

While I concur in part with the opinion of the court, I must respectfully dissent from the holding of the majority that liability may be predicated on a violation of the city sewer use ordinance and from its holding that the district court should reexamine its ruling with respect to the defendant's Texas plant absent any evidence showing a similarity of the two operations.

I

I think it of some consequence that the factual background of the case concerning dates be stated in slightly more detail than is done by the majority opinion, which to me lumps together whatever liability there may be.

Schlitz produced its first beer at the Winston-Salem brewery about July 1, 1969. At that time, there was no sewer use ordinance, that is to say, no limitation was placed by the city upon the character, quantity or strength of waste which could be put into the sewer system.

On February 2, 1970, the sewer use ordinance referred to in the opinion was enacted to become effective May 1, 1970. The city did not advise Schlitz or any other industrial user of the ordinance and of the necessity of obtaining a permit until June 11, 1970. As the majority opinion sets out, the waste containing more than 2500 ppm BOD from Schlitz has not continued after April 1971. So any liability of Schlitz under any theory must be limited by the April 1971 date, and any liability based on an unlawful discharge into the system must commence with the May or June 1970 date.

II

Since there was no municipal ordinance or statute requiring Schlitz to connect to the sewer facility of Winston-Salem, and Schlitz was not within the city but rather in Forsyth County, I am in agreement with the majority opinion as it compares the relation of Schlitz and the city as that of a disposer of waste who has agreed with an independent contractor to have such waste disposed of.

With that in mind, I believe the proper rule is as stated in Page v. Sloan, supra, that if Schlitz knew, or if by the exercise of reasonable care might have ascertained that the city was not properly qualified to undertake the work, Schlitz may be held liable for the negligent act of the city. And I note this rule requires not only knowledge or lack of reasonable care on the part of Schlitz, but also the negligent act of the city in the disposal of the waste, or in the agreement so to do.

III

In my opinion, no violation of the sewer use ordinance was shown because of the construction placed on the ordinance by the city.

The last paragraph of § 23–4 allows the city to assist "industrial users" "in devising procedures and constructing equipment to reduce or eliminate . . . objectionable characteristics or properties which may not otherwise be discharged into the public sanitary sewers under § 23–2." Thus, as the majority recites, the ordinance shows on its face that it was not meant for instantaneous compliance. At the very best, from the plaintiff's viewpoint, it is ambiguous.

The uncontradicted and undenied testimony of the plaintiff's witness Styers supports this conclusion:

> "This is something that had never been developed before. It's new for municipalities. It's new for industries, and when you pass a law of this sort, you don't the next morning go out and clamp a padlock on every industry in town. You have to give them some period of time in which they can comply with the ordinance. If we had done that, then we would have shut

down just about every industry in Winston-Salem."

Styers further stated:

"When we were making this ordinance, we knew—this came up quite a bit—we knew that on the date that the ordinance was passed, we could not expect these industries to be informed of their wastes, the characteristics of their wastes, and what they would have to do to their wastes. We knew that after we made tests and confronted them with the quantities of materials they were discharging, that they would have to hire engineers to construct or to design plants. They would have to hire contractors to build these facilities and to alter their characteristics of waste. *And, therefore, in that ordinance, we provided for this interim period where the City would have the opportunity to give them the opportunity to do whatever was necessary to comply with the regulations.*" [1] [Italics added]

It is then clear from the uncontradicted testimony that the city did not view the sewer use ordinance as requiring immediate compliance, but rather interpreted the set of ordinances as requiring reasonable efforts to comply. There is no evidence that Schlitz did not act in a reasonable manner in seeking to comply with the provisions after their passage; indeed, as the district court pointed out, the plaintiff's own evidence showed Schlitz made a determined cooperative effort to comply with the ordinances.

The city officials, then, who were entrusted with the administration of the ordinance construed it as permitting time to comply.

Courts generally prefer an ordinary and practical construction of an ordinance, and the construction given an ordinance by those charged with the duty of applying its provisions and enforcing them prior to the controversy "is very persuasive." 6 McQuillin, Municipal Corporations (3rd Ed. 1969) § 20.45; United States v. Cerecedo Hermanos y Compa-

nia, 209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821 (1908).

While the statement in the majority opinion that "[p]ublic officials have no more power to alter . . . private rights than the legislature chooses to give them," is a correct abstract statement, in my opinion it should not be applied here. It does not take into account the chronological setting of events in this case, and does not take into account the construction the city placed on its own ordinance. Prior to 1970 there had been no ordinance so regulating waste placed into the system. Then, the ordinances in issue here were passed. Conceding that the acts and interpretations of the officials of the city may not be used to abrogate private rights, such contemporaneous acts and interpretations are admissible and important to the construction of such ordinances, and the determination of whether such ordinances have in fact been violated.

The general rule is that when dealing with the interpretation of an ambiguous city ordinance, one must consider contemporaneous interpretations of the ordinance by city officials, 6 McQuillin, Municipal Corporations § 20.45 (3rd Ed. 1969); Hecht Co. v. McLaughlin, 93 U.S. App.D.C. 382, 214 F.2d 212 (1954); Savings Bank of Rockville v. Wilcox, 117 Conn. 188, 167 A. 709 (1933).

An unambiguous ordinance should be interpreted on its face alone, but "in doubtful cases where the language of an ordinance is ambiguous, a contemporaneous construction adopted by the parties interested in the enforcement of the ordinance, while not controlling, is entitled to great weight, and is sometimes given an effect in the nature of estoppel or waiver with respect to the assertion of a different meaning." 6 McQuillin, Municipal Corporations (3rd Ed. 1969) § 20.45.

Since it is clear to me that the construction placed by the city on its own ordinances was the only reasonable one (a contrary construction would have shut down about every industry in Winston-

---

1. Styers had been Superintendent of the Sewage Treatment Plant for the city.

Salem), and that Schlitz had complied with the ordinances as construed by the city authorities charged with their enforcement, I am of opinion liability should not be based upon a violation thereof.

## IV

With the district judge, I see no connection between the Texas operation of Schlitz and the North Carolina operation. If the operations were proven to be similar, then I think what Schlitz knew about the Texas operation at the relevant times in the North Carolina affair might be admissible as evidence of knowledge. But I cannot find that the similarity of the operations has been proved. Therefore, I would not require the district court to reexamine its ruling that the evidence was irrelevant absent some proof of similarity of the Texas and North Carolina operations. "The determination of the relevancy of proof offered at the trial is a matter resting largely within the sound discretion of the trial court and is not ordinarily reviewable upon appeal." Beaty Shopping Center v. Monarch Insurance Company of Ohio, 315 F.2d 467, 471 (4th Cir. 1963).